**KLESTADT WINTERS JURELLER**
**SOUTHARD & STEVENS, LLP**
200 West 41st Street, 17th Floor
New York, NY 10036
Telephone: (212) 972-3000
Facsimile: (212) 972-2245
Tracy L. Klestadt
Lauren C. Kiss
Stephanie R. Sweeney
Andrew C. Brown

*Proposed Counsel to the Debtor and Debtor-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-----------------------------------------------------------x
In re                                    :
                                         :        Chapter 11
PUBLISHERS CLEARING HOUSE LLC,           :
                                         :        Case No. 25-10694 (MG)
                                         :
                        Debtor.          :
-----------------------------------------------------------x
```

**DECLARATION OF WILLIAM H. HENRICH, CO-CHIEF RESTRUCTURING OFFICER OF THE DEBTOR, PURSUANT TO LOCAL BANKRUPTCY RULE 1007-2 IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY MOTIONS**

William H. Henrich, being duly sworn, declares and states, under penalty of perjury pursuant to 28 U.S.C. § 1746, as follows:

1.      I am a Co-Chief Restructuring Officer ("CRO") of the above-captioned debtor (the "Debtor" or "PCH"), which filed a voluntary chapter 11 petition on April 9, 2025 (the "Petition Date") commencing this case (the "Bankruptcy Case"). I am also Co-Chairman of Getzler Henrich & Associates LLC ("Getzler Henrich").

2.      I have over 35 years of corporate restructuring experience. I have guided numerous company turnarounds and workouts, having served as chief restructuring officer and independent

1

board member for a number of companies.  I possess a strong track record of turning around unprofitable companies and creating significant value for shareholders.

3.      Prior to joining Getzler Henrich, I was managing director and founder of the New York practice of a prominent middle-market corporate restructuring firm.  In 1982, I started Arthur Andersen's New York bankruptcy and restructuring practice and was a member of the core partner group responsible for establishing policy and directing the practice nationwide.  I also held senior executive finance, operational and sales/marketing positions with Arrow Electronics, the world's largest electronics distribution company, where I helped significantly reduce operating costs, improve market penetration and increase profitability.  I am a former president and current advisory board member of the New York Chapter of the Turnaround Management Association and a board member of the American Bankruptcy Institute.  I am a Certified Public Accountant and hold a master's degree in business administration from Baruch College, City University of New York.

4.      Specific areas of my expertise include: (a) operational restructuring, improving business operations, management practices, cash flow and profitability; (b) financial restructuring, negotiating and implementing corporate finance solutions including debt restructuring, refinancing, and distressed mergers and acquisitions; (c) evaluating/crafting company operations, business plans, and financial projections; (d) guiding companies through workout, turnaround and chapter 11 processes and maximizing their value and recovery for stakeholders, including as interim CEO or CRO inside and outside of chapter 11; (e) advising secured and unsecured creditors during chapter 11 proceedings, including developing plans of reorganization and providing bankruptcy forensic analysis to support litigation; and (f) providing expert testimony on various matters including, among other things, financing, asset sales and feasibility.

5.      Getzler Henrich has been retained to provide crisis and restructuring management and related services in connection with the restructuring of the following companies, among others, in jurisdictions around the country: *In re Presperse Corp.*, Case No. 24-18921 (Bankr. D.N.J. Oct. 10, 2024); *In re Aztec Fund Holding Inc., et al.*, Case No. 24-90436 (Bankr. S.D. Tex. Sep. 27, 2024); *In re ConnectEdu, Inc., et al.*, Case No. 14-11238 (Bankr. S.D.N.Y. June 16, 2024); *In re SC Healthcare Holdings, LLC*, Case No. 24-10443 (Bankr. D. Del. Apr. 23, 2024); *In re Urban Commons 2 West LLC, et al.*, Case No. 22-11509 (Bankr. S.D.N.Y. Dec. 1, 2022); *In re Hamon Holdings Corp., et al.*, Case No. 22-10375 (Bankr. D. Del. June 10, 2022).

6.      On or about January 29, 2025, I was retained by the Board of Directors of PCH (the "Board") as CRO given my experience as strategic advisor in the field of business restructuring. Laurence Sax, Managing Director of Getzler Henrich, assisted me in that role from the outset, and was recognized and appointed as co-CRO with me by the Board on or about April 4, 2025.

7.      I submit this declaration (the "Declaration") in accordance with Rule 1007-2 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York (the "Local Rules") and in connection with the Debtor's voluntary petition (the "Petition") for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") filed in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") on April 9, 2025 (the "Petition Date").

8.      I make this Declaration in support of the Debtor's Petition, to provide the Court and all parties in interest with an overview of the Debtor, its business, and the events precipitating the commencement of the Bankruptcy Case, and in support of certain immediate relief being sought by the Debtor, as further set forth herein.

9.       Except as otherwise indicated herein, the facts set forth in this Declaration are based on my personal knowledge, my review of relevant documents, information provided to me by the Debtor's management, employees or professionals, or my opinion based upon my experience, knowledge, and information concerning the Debtor's operations and financial affairs.  If called upon to testify, I would testify competently to the facts set forth in this Declaration and that I am authorized to submit this Declaration on behalf of the Debtor.

10.     On the Petition Date, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court.  The Debtor commenced the Bankruptcy Case to reorganize under Chapter 11 of the Bankruptcy Code.  I have reviewed the Petition and all documents filed in connection therewith, and I am generally familiar with the facts alleged and relief requested therein.

11.     There is no other or prior bankruptcy case filed by or against the Debtor.  To the best of my knowledge, no committee of unsecured creditors has been organized prior to the entry of the order for relief in the Debtor's Bankruptcy Case.  It is anticipated that the United States Trustee (the "UST") will schedule an organizational meeting soon after the Petition Date and may form an official committee of unsecured creditors (a "Creditors' Committee") at that time.

12.     A copy of the resolutions authorizing the Debtor to file the Bankruptcy Case and appointing me and Mr. Sax as co-CROs is attached to the Petition and incorporated by reference herein.  Unless otherwise indicated, all financial information contained herein is presented on an estimated and unaudited basis.

## I.      Corporate and Ownership Structure

13.     Publishers Clearing House LLC was formed as a partnership in 1953 by Harold and LuEsther T. Mertz and their daughter Joyce in the basement of their Long Island home.  The

company was reformed as a New York limited partnership in 1957 and then converted into a New York limited liability company in 2002. The Debtor has done business under the trade names Liquid Wireless, Liquid, Funtank, and PCH Media.

14.     The Debtor has five (5) non-debtor wholly-owned subsidiaries, each of which is inactive. Attached hereto as **Exhibit A** is the Debtor's corporate structure chart.

15.     A list of the equity security holders of the Debtor has been filed with the Petition. PCH is essentially a family-owned company. The Shareholders consist of a number of individuals, both as successors to the original founders and as remaindermen and beneficiaries of trusts created by them for the benefit of nieces and nephews of Harold and LuEsther Mertz, and various charitable interests. Almost 55% of the equity interests in PCH are held by charities and charitable trusts created by the founders, other family members or their successors that support the arts, the environment, medical research and facilities, first responders and other worthy causes. There are no shareholders who are individuals other than members of the Mertz family or their descendants and successors. Shareholders play no role in management. No family member is employed by PCH, and no family member has executive power or authority.

## II.     The Debtor's Business

### A.     Overview

16.     PCH has become known across America as the sweepstakes company whose famous Prize Patrol surprises winners on their doorsteps, presenting oversized checks ranging from $10,000 to Multi-Millions while TV cameras are rolling. The company has awarded over half a billion dollars in prizes and has evolved to offer many ways to win online and through social media and mobile access. Today, PCH's sweepstakes continue to attract millions of contestants, allowing PCH to generate revenue primarily through sales of curated digital advertising throughout its

network of web and app-based entertainment platforms. PCH currently has approximately 105 employees[1] with annual gross revenue of approximately $38 million. Due to PCH's declining financial condition, the last distributions to members, including the charitable interests, were made in 2022 for the 2021 tax year.

**B.      Original Founding**

17.      PCH's business began when Harold Mertz, who had worked in the magazine business, created the opportunity for many magazine publishers to solicit subscribers to their titles through a single direct mail offer. Mertz called it a "car pool for publishers" and it was almost immediately successful. The company's first mailings were of 10,000 envelopes sent from the Mertz' home on Long Island, New York, and offered 20 magazine subscriptions. The concept was simple. Should a consumer choose to order a title from the PCH mailing, magazine publishers would receive a portion of order revenue, and PCH would retain the rest as a commission on the sale. In addition, the magazine publishers would then have the ability to more economically contact consumers directly for renewal subscriptions. Having started in the basement of his home, Mr. Mertz often joked that there was no other way to go than up! And up the company did quickly rise. The concept took off, and the business profited by the efficiencies that it offered to the publishers.

**C.      Sweepstakes Introduction**

18.      In 1967, PCH introduced its first direct mail sweepstakes, allowing customers to enter for a chance to win a monetary prize regardless of whether or not they purchased a magazine subscription. The concept of a nationwide direct mail sweepstakes had first been popularized several years earlier by *Reader's Digest*. The PCH sweepstakes offers were an immediate and

---

[1] Within the year prior to the Petition Date, the Debtor terminated approximately three hundred (300) employees. Terminated employees who are owed amounts from the Debtor will be listed on the Debtor's Schedule E/F.

overwhelming success, quickly joining magazine offers as the hallmark of the company.  Mailings combined discounted magazine subscription offers with the opportunity to enter sweepstakes— always emphasizing that no purchase was ever necessary to enter.  The offer resonated with millions of consumers, making PCH a household name.  From the 1960s through the 1990s, PCH was often recognized as one of the largest mailers in the country, second only to the IRS during tax season.

### D.   Prize Patrol Creation

19.    Initially, PCH winners were selected and notified by phone or mail to let them know they had won.  However, witnessing the joy and excitement of winners inspired the company to experiment with live, in-person prize announcements without prior notice.  The success of this approach led to the creation of the PCH "Prize Patrol" in 1989.  The Prize Patrol, a team of PCH employees, began surprising winners at their doorsteps with balloons, champagne, flowers, and the now-famous Big Check.  These surprise visits were filmed and featured in PCH's television commercials, showcasing the genuine excitement of unsuspecting winners.  The Prize Patrol quickly became a cultural phenomenon, humorously referenced in popular shows such as *Seinfeld*, *Saturday Night Live*, *Cheers*, and numerous cartoons, TV shows, and movies.  In a memorable moment, President George W. Bush joked publicly, after acknowledging that Al Gore had won the Nobel Peace Prize, that he might win something, maybe the Publishers Clearing House sweepstakes, in his own retirement.  The iconic Big Check became a universal symbol of prizes, giveaways, and charitable contributions, with its creative imagery widely imitated by others to represent awards and significant donations.

### E.       Moving Beyond Magazines/Diversification

20.      PCH experienced significant growth and success throughout the 1960s, 1970s, and 1980s, fueled by direct mail magazine offerings and ubiquitous television commercials.  In the early 1990s, the company diversified its offerings beyond magazine subscriptions, introducing a wide range of products such as books, collectibles, coins, sports memorabilia, and home goods. The expansion to products proved to be a major success, as consumers enthusiastically embraced the variety of merchandise available through PCH's direct mail campaigns.  The profitability of these new offerings sustained growth and helped shield the company from the challenges faced by the magazine industry, which was gradually transitioning to digital platforms as publishers adapted to the online era, as print publications withered.

### F.       Company Leadership in Industry

21.      As PCH expanded its success and reputation, its employees emerged as leaders in the direct marketing and merchandising industries.  PCH employees took on influential leadership roles within prominent organizations such as the Direct Marketing Association (DMA), serving as members and Chairs of key DMA committees, including the Ethics Policy Committee, the Ethics Operating Committee, the Privacy Committee, the Postal Committee, and Government Affairs Committees.  PCH's leadership was frequently recognized for their contributions to the industry. For instance, PCH management was repeatedly honored by the Marketing Club of New York with the prestigious Silver Apple Awards, which celebrate career achievements and community contributions in the marketing field.

22.      Additionally, PCH employees played a vital role in postal rate policy discussions. They held a prominent place at the table during negotiations and feedback sessions with the Postal

Rate Committee and the Postal Service, hoping to ensure fair and economical decision-making regarding third-class postal and shipping rates.

23.     On the consumer protection front, PCH employees actively participated in organizations such as the National Consumers League, the Society of Consumer Affairs Professionals, the Better Business Bureau Steering Committee, the Alliance Against Fraud, and the FTC Partnership for Consumer Education.  For 28 consecutive years, PCH has been a named supporter of the National Consumers League's annual Trumpeter Dinner, which honors individuals who have significantly impacted consumer protection.  Over the past nine years, PCH has been recognized by the Federal Trade Commission ("FTC") in their annual Consumer Sentinel report as a leading partner and contributor to the FTC's anti-scam database that is shared with domestic and international law enforcement to combat illegal lottery and sweepstakes scams, including "imposter" schemes in which scammers pose as members of the Prize Patrol or as recognized PCH employees in order to dupe consumers.

24.     Most recently, over the past three years, PCH has been recognized in the Better Business Bureau's annual full-page New York Times ad.  This ad honors companies that exemplify the Bureau's mission of trust and integrity.

**G.     Philanthropic and Charitable Contributions.**

25.     In 1959, the Mertz family used proceeds from their growing business to establish The Mertz Foundation, marking the start of a rich history of philanthropic contributions.  The foundation supported causes including the arts, human and civil rights, environmental protection, and health care.  This initiative was the precursor to a broader commitment to charitable giving.  Over the years, over 40% of PCH profits have gone directly to and for the benefit of charitable interests, enabling significant contributions to a wide range of causes.  While the full extent of

these efforts is too vast to capture in detail, the following highlights demonstrate the scope and

impact of this philanthropy:

- **International Peace:**  The Mertz family provided funding that was key to the success of "Ping Pong Diplomacy" between the United States and China.
- **Civil Rights**: Through the Mertz family's friendship with social activist and civil rights leader Bayard Rustin, funds supported the organization of the 1963 Civil Rights March on Washington.
- **Theater and the Arts**: Trusts provided critical support to the famous Shakespeare in the Park program through the New York Public Theater.  Mertz funding was credited with saving the production of *A Chorus Line*, enabling the musical to continue rehearsals for its move to Broadway.
- **Joyce Theater**: The Joyce Dance Theatre of New York was founded in memory of Joyce Mertz, the late daughter of Harold Mertz and has benefited over the years from continuing gifts from the Mertz family.
- **Lincoln Center**: Trusts have made significant contributions to Lincoln Center for the Performing Arts. Renowned director Bartlett Sher currently holds the title of Lincoln Center Theatre's Mertz Resident Director.
- **Public Television**: The LuEsther T. Mertz Charitable Trust has been a major supporter of public television, with its name credited on numerous PBS broadcasts.
- **New York Botanical Garden**: The Mertz Library at the New York Botanical Garden was established with support from the LuEsther T. Mertz Charitable Trust.
- **Medical Research**: The Mertz Retinal Research program at the Manhattan Eye, Ear, and Throat Hospital received significant contributions to advance macula health care.
- **St. Jude Children's Research Hospital:**  Through PCH's consumer facing "Giveback" campaign, PCH has contributed over $1 Million dollars to St Jude over the past 13 years.

### H.   Digital Transition

26.     While traditional mail-order marketing continued, PCH looked to the future and, in

the late 90's, added digital marketing under the pch.com banner.  The company expanded its digital

presence through the acquisition of several digital sites and the offering of online games, quizzes,

and sweepstakes to attract a new generation of customers.

27.     PCH  acquired the assets of search company Blingo in 2006, online gaming

company Funtank in 2010, mobile marketing company Liquid Wireless in 2012, entertainment

focused quiz content creator Topix in 2019, and digital publishers Wide Open Media in 2020.

Blingo Inc. brought to PCH an ad-supported metasearch engine that was later re-branded as PCH

Search & Win, providing significant income to PCH at the time with little overhead. Changes in the online search business have since reduced the revenue-earning opportunity represented by the Search & Win program, which is no longer a meaningful contributor to the Debtor's overall revenue. However, the creation of the online e-commerce marketing programs became a primary source of online revenue, along with third party advertising, search and other related online programs. As 2018 approached, company revenue came close to crossing the $1 billion mark.

28. However, while PCH's direct mail and e-commerce programs were profitable for decades, changing patterns of consumer behavior, costs and competition, along with a declining pool of new prospecting names, negatively impacted the business, resulted in losses beginning in 2022. Consumer expectations were rapidly shifting toward speedy fulfillment and cost-free shipping, both unsustainable for PCH with its low-priced, impulsive-purchase product offerings. Increased paper and shipping costs, combined with the dominance of major commerce platforms like Amazon and Walmart online stores, offering fast, free delivery of an astonishingly wide range of products, resulted in decreasing consumer demand, revenue and margins within the commerce business, resulting in rapidly increasing operational losses (see Fig. 1).

**Fig. 1 (amounts in 000's)**

|  | Projected 2025 | 2024 | 2023 | 2022 | 2021 | 2020 | 2019 | 2018 | 2017 |
|---|---|---|---|---|---|---|---|---|---|
| Magazine Revenue | $    - | $    - | $1,053 | $3,398 | $8,996 | $13,621 | $19,345 | $21,065 | $23,131 |
| Merchandise Revenue | $    - | $181,907 | $335,708 | $83,847 | $649,057 | $724,000 | $821,794 | $857,904 | $831,286 |
|  | **$    -** | **$181,907** | **$336,761** | **$487,245** | **$658,053** | **$737,621** | **$841,139** | **$878,969** | **$854,417** |

29. As a result, PCH made the incredibly difficult decision to begin winding down its commerce division, finalizing this closure at the end of 2024. Throughout this time, PCH remained committed to providing its consumers with highly engaging entertainment experience powered by

sweepstakes and contests opportunities via its digital marketing platforms. PCH's shift away from commerce has allowed it to focus on new avenues of future growth and profitability, better aligned with its current strengths.

## I.     The Debtor's Current Operations and Revenue

30.     Today, PCH offers a robust variety of free-to-play, chance-to-win digital games and entertainment across a network of web and app-based entertainment properties. PCH's continued success in the digital publishing environment is built on its unique, free-to-play, chance-to-win propositions. Data and analytics have always been at the core of the PCH business strategy, optimizing engagement through relevant, personalized offers, based on the trusted first-party relationship PCH has with its audience.

31.     Through the PCH/Media division, consumer brands and advertising agencies are able to build direct-to-consumer relationships. PCH's web properties and apps are ad-supported and attract millions of visitors every year – **approximately 36 million in 2024**. PCH has a highly engaged user base which allows the company to serve relevant, interest-based, targeted advertising to specific audience segments. Success in digital publishing relies on traffic, quality content and consumer engagement. With PCH's sustained consumer engagement, and continued development of quality content in the casual gaming, survey and quiz spaces, PCH is able to maximize ad revenue by offering attractive placements to advertisers.

32.     Advertisers pay PCH through a variety of engagement metrics, such as ad views, clicks and/or user actions. By leveraging PCH's rich first-party data, the company offers highly targeted ad placements, which is a huge competitive benefit.  Through PCH's use of audience segments, it provides the ability to accurately reach relevant audiences. Advertisers can come to PCH and target a specific demographic or affinity group resulting in the advertising being more

valuable since it is reaching consumers who are more likely to be interested in the offering.  PCH

offers a variety of highly compelling ways for advertisers to reach their audience, including email

marketing (Fig. 2), video, display (Fig. 3) and programmatic (see Fig. 4) advertising.

**Fig. 2**                                                    **Fig. 3**

                    

**Fig. 4**



III.   **Circumstances Leading the Debtor to File the Bankruptcy Case**

A.   **Legal Challenges**

33.   Despite prominent and repeated "no purchase necessary" messaging, the sweepstakes industry—including major players such as *Time-Life, Reader's Digest*, and PCH—came under regulatory scrutiny in the late 1990s.  Concerns were raised by state Attorneys General and Congress over consumers mistakenly believing that making purchases would improve their chances of winning sweepstakes.  Settlements were reached with all major nationwide sweepstakes marketers, including PCH, with its $18 million settlement with 24 states in 2000 and its $34 million settlement with 23 other states shortly thereafter.  Additionally, in 2010, the company reached an agreement with the Attorneys General of 32 states and the District of Columbia to expand terms of the prior settlements, paying an additional $3.5 million.

34.   The FTC revisited these issues in 2018, alleging that PCH's "no purchase necessary" messaging was unclear, and that its online offers used so-called "dark patterns" to manipulate consumers into ordering.  PCH countered with evidence showing that 99% of entries were submitted without a purchase.  However, the potential for protracted litigation, threats of injunctive efforts, and the company-wide distraction left PCH with little choice but to resolve the matter with a costly settlement of $18.5 million at a time when PCH was facing new business challenges.

B.   **Mounting Headwinds Leading to Filing**

35.   As mentioned above, while product sourcing, shipping and postal rates continued to rise, PCH and other direct marketers faced growing challenges in competing with well-funded behemoths offering a wider range of products, free shipping, free returns, and overnight delivery.  Despite efforts by PCH and industry peers to negotiate discounts with the Postal Service in

exchange for mail volume commitments, these proposals were ultimately rejected by the Postal Rate Commission.  As third-class mail and shipping costs escalated, many direct mail marketers were forced to close, leading to a shrinking pool of new mailing lists which had traditionally been a primary source for PCH's new customer acquisition program. Television advertising, once a cornerstone of PCH's new customer acquisition program, became increasingly constrained and less effective.  Costs for 30-second and 1-minute TV spots rose significantly, while audiences fragmented across numerous channels and streaming platforms, making it harder to reach the mass audiences of earlier decades.  These critical sources for new customers and increased growth rapidly declined, leading to significant challenges in acquiring and retaining customers, which is the life-blood of any direct-to-consumer business.

36.     The onset of the COVID-19 pandemic introduced additional cost pressures, including inventory challenges, tangled supply chains and delayed shipments.  Simultaneously, consumers increasingly turned to value-driven online retailers like Amazon and Walmart.  These shifts further strained PCH's traditional direct mail and e-commerce business models.  As direct mail and ecommerce costs continued to rise at a problematic rate, PCH turned increasingly to its digital businesses.

37.     The company was particularly enthusiastic about the potential for growth and viability through the first party data consumers provided to PCH, which PCH maintains and can share (subject to the ability to opt-out) in accordance with its published Privacy Policy (the "Privacy Policy"), available at https://privacy.pch.com.   While such first-party data is exceptionally accurate, broader challenges persist that have made such efforts all the more difficult: (i) industry-wide declines in programmatic advertising rates hindered revenue growth, (ii) Google's delays in phasing out third-party cookies slowed the anticipated increase in the value

of PCH's first-party data, (iii) while PCH's first party data continues to be seen as holding significant value, the ability to monetize such data with third parties has been slower than anticipated, and (iv) as business challenges increased, the company was also embroiled in the FTC litigation described above.

38.     The company's transition to digital marketing while still burdened by the debts associated with its legacy commerce business created a challenging environment that led directly to the current reorganization filing.

**IV.     Debtor's Chapter 11 Reorganization Goals**

39.     The Debtor's goals in the Bankruptcy Case are to restructure and streamline its operations, by shedding burdensome legacy debts and leasehold interests, increasing its online presence and positioning itself to emerge as a more efficient and modern business, all while continuing to deliver life-changing prizes to its former and future contestants.  In tandem with these restructuring efforts, the Debtor intends to seek to obtain a debtor-in-possession receivables purchase financing facility in a maximum amount of up to $5,500,000, as described below, and to consider opportunities to sell substantially all of its assets to the highest bidder at auction, free and clear of its legacy commerce business liabilities.

40.     In connection with any such sale, consistent with Section 332 of the Bankruptcy Code, the Debtor will seek the appointment of a consumer privacy ombudsman to assist the Debtor in ensuring that the confidentiality of personally identifiable information is maintained and protected in accordance with the Debtor's Privacy Policy and applicable law.

V.    **Debtor's Assets and Liabilities**

A.    **Assets**

41.    The Debtor's primary assets consist of cash, accounts receivable and intellectual property.

42.    As of the Petition Date, the Debtor maintained the following bank accounts:

| Financial Institution | Type of Account | Last 4 Digits of Account | Balance on Petition Date |
|---|---|---|---|
| Bank of America | Checking | 2917 | $2,939.89 |
| Wells Fargo | Operating – Master Concentration | 9182 | $61,994.43 |
| Wells Fargo | Operating – Consumer Commerce (funds master concentration) | 8976 | $0 |
| Wells Fargo | Operating – B2B DIP Factor DACA Account | 0394 | $0 |
| Wells Fargo | Operating – Trade and Winner AP Checks (funded by master concentration) | 7704 | $0 |
| Wells Fargo | Operating – Winner Checks less than $10,000 (funded by master concentration) | 9915 | $0 |
| Wells Fargo | Payroll (funded by master concentration) | 9205 | $0 |
| Wells Fargo | Refunds (returns) (funded by master concentration) | 0082 | $0 |
| Wells Fargo | Refunds (returns) (funded by master concentration) | 0097 | $0 |
| Wells Fargo | Security Account – Collateral for P-Cards | 4882 | $75,795.93 |
| Wells Fargo | Security Account – Collateral for NYC Lease (security deposit) | 7787 | $194,561.06 |
| Truist Bank | Escrow Account – NY Bus. Law Collateral Account | 8015 | $155,000 |
| | | **TOTAL** | $490,291.31 |

43.    The cash held and revenue received by the Debtor represents the primary source of funds available to fund ongoing expenses, including payroll, insurance, the Debtor's obligations to prize winners, professional fees and other costs associated with the Bankruptcy Case.

44.    The Debtor owns domain names and various registered trademarks and patents used or useful in the operation of its business and symbolizing the goodwill associated with the

company. The Debtor also maintains personally identifiable information with respect to its contestants in accordance with the terms of its Privacy Policy.

**B.** **Liabilities**

45.     The Debtor does not have any prepetition secured indebtedness, except under computer equipment leases secured solely by the computer equipment financed, and under the lease agreement for its premises in Jericho, New York secured by certain personal property maintained at the leased premises.

46.     The Debtor's prizes are paid in lump sums or installments over time, depending upon the contest. The Debtor's prize liability is discussed in more detail below in connection with its Customer Programs Motion (defined below). The Debtor is seeking authority to continue paying all winners of sweepstakes and contests in the ordinary course of its business, including all prizes awarded prepetition as they come due.

47.     The Debtor additionally has unsecured liabilities of approximately $40,000,000 as of the Petition Date owing to employees, vendors, service providers and landlords.

**VI.** **First Day Motions**

48.     To enable the Debtor to operate effectively and minimize potential adverse effects during the pendency of the Bankruptcy Case, the Debtor is requesting certain relief in "first day" motions and applications filed with the Court concurrently herewith (collectively, the "First Day Motions")[2]. The First Day Motions, summarized below, seek to implement procedures that will promote a seamless transition into the Bankruptcy Case, allowing the Debtor to continue paying its employees, continue to make payments to existing prize winners in the ordinary course of

---

[2] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the corresponding First Day Motion.

business, and generally minimize any potential adverse effects on the Debtor's operations during the reorganization process.

49.     I believe that the relief requested in each First Day Motion is necessary to preserve and maximize the value of the Debtor's estate, essential to the successful reorganization of the Debtor, and in the best interest of the Debtor's estate, creditors, customers, prize winners, and other parties in interest.

### A.     Application to Retain Omni Agent Solutions, Inc. as Claims and Noticing Agent

50.     The Debtor anticipates that well over 250 entities, and likely thousands of individuals, will need to be served in connection with the Chapter 11 Case. As a result, the Debtor is obligated to retain a claims and noticing agent pursuant to Local Rule 5075-1(b)(1). The Debtor has selected Omni Agent Solutions, Inc. ("Omni") as claims and noticing agent in accordance with the Court's Protocol for the Employment of Claims and Noticing Agents under 28 U.S.C. § 156(c). The Debtor obtained and reviewed engagement proposals from at least two (2) other court-approved claims and noticing agents to ensure a competitive process. Based on all engagement proposals obtained and reviewed, Omni's rates are competitive and reasonable given Omni's quality of services and expertise. Accordingly, I believe that approval of the retention of Omni as Claims and Noticing Agent is in the best interests of the Debtor's estate.

### B.     Motion for Authority to Enter Into a Post-Petition Senior Secured Financing Facility

51.     With this Motion (the "DIP Motion"), the Debtor seeks entry of interim and final orders authorizing the Debtor to enter into a post-petition senior secured receivables purchase financing facility to be provided by Prestige Capital Finance LLC (the "DIP Factor") in the amount of up to $5,500,000 at any time outstanding, with up to $2,500,000 available on an interim basis,

subject to increases based upon the Debtor's request and the DIP Factor's approval, substantially upon the terms set forth in that certain Purchase and Sale Agreement and DIP Addendum (the "DIP PSA") attached to the DIP Motion as Exhibit B (the "DIP Facility").

52.     The DIP Facility is the best and most cost-effective financing available to the Debtor after diligent search.  Prior to the Petition Date, the Debtor and its advisors, including myself and Laurence Sax as Co-Chief Restructuring Officers, and SSG Advisors, LLC ("SSG") as investment banker, conducted a diligent search for financing and other strategic transactions on behalf of the Debtor. After approaching a wide group of lenders and factors, three interested parties made proposals to provide a debtor-in-possession financing facility. The terms proposed by the DIP Factor were the best terms available, as they provided the necessary level of availability at the most favorable rates. After good faith negotiations with all interested parties, the Debtor, in consultation with its advisors and co-CROs, determined in its business judgment that the DIP Facility was the most favorable financing available and in the best interest of the estate and its creditors.

53.     As illustrated in the Budget attached hereto as **Exhibit H**, the Debtor requires the liquidity provided by the DIP Facility to pay expenses in the ordinary course of business as required to retain employees, maintain its websites and social media platforms, continue customer acquisition, pay advertisers and suppliers, and deliver upon its promises to prize winners.  Without the DIP Facility, the Debtor's operations and incoming revenue would come to an immediate halt, resulting in irreparable harm to its operations and the goodwill of its business.

54.     The DIP Facility will allow the Debtor to preserve value while the Debtor and its advisors restructure the Debtor's balance sheet and engage in a process to maximize the value of the business as a going concern. I therefore believe the DIP Facility is a reasonable exercise of the

Debtor's business judgment, is in the best interests of all creditors and other parties in interest, and should be approved.

### C.   **Motion for Continuation of Cash Management Systems**

55.     The Debtor will be filing a motion seeking the entry of interim and final orders authorizing, but not requiring, the Debtor to: (a) continue use of its existing cash management system by, among other things, (i) maintaining its existing Bank Accounts, (ii) maintaining its P-Cards and, in connection therewith, paying certain of the pre-petition charges on the P-Cards, including payments for general and administrative business expenses incurred in the ordinary course of business that will not include any payments made for the benefit of "insiders"; and (b) continue to use their Business Forms in the same manner in which they existed prior to the Petition Date (the "Cash Management Motion").

56.     The Debtor maintains ten (10) bank accounts with Wells Fargo Bank, N.A., one (1) bank account with Bank of America, N.A., and one (1) bank account with Truist Bank.  All of the aforementioned banks are designated as authorized depositories in the Southern District of New York.  The Cash Management Motion additionally provides for the deposit account control arrangement required to facilitate the DIP Facility.

57.     In the ordinary course of business, the Debtor utilizes a multitude of check types, including custom checks that are sent to the Debtor's various prize winners.  Additionally, the Debtor uses a variety of correspondence and business forms, including, but not limited to, letterhead, purchase orders and invoices, including the distribution of various custom designed promotional materials to its customers.  To minimize the expense to the Debtor's estates associated with developing and, or, purchasing entirely new forms, the delay in conducting business prior to obtaining such forms and the confusion of employees, customers and suppliers, the Debtor seeks

authority to continue to use all correspondence, business forms, and checks as such forms existed immediately prior to the Petition Date, without reference therein to the Debtor's status as a debtor-in-possession. However, following the depletion of the Debtor's various correspondence, business forms, and checks, the Debtor will obtain new forms reflecting its statuses as a debtor-in-possession.

58.     I believe that the relief requested in the Cash Management Motion is in the best interest of the Debtor's estate, its creditors, and all other parties in interest and will facilitate the Debtor's ability to operate its business in chapter 11 without disruption.

### D.     Motion to Continue Customer Programs and Sweepstakes and Honor Related Prepetition Obligations

59.     The Debtor will be filing a motion seeking entry of interim and final orders authorizing the Debtor to continue its Sweepstakes and Contests, Advertiser and User Acquisition Programs, Marketing Programs, and Refunds and Billing Adjustments (the "Customer Programs") in the ordinary course of its business, and to honor prepetition obligations to prize winners and critical vendors necessary to the maintenance of such Customer Programs (the "Customer Programs Motion").

60.     The Debtor's Sweepstakes and Contests are awarded both in lump sums and in annuity-style installments. Lump sum prizes are awarded on an ad hoc basis. In general, on a daily basis, the Debtor may award prizes ranging from $50-500, and on a weekly basis the Debtor may award one or more $10,000 prizes. On average, approximately $30,000 is due in lump sum prizes each week. The aggregate amount due to prepetition prize winners in lump sums as of the Petition Date is approximately $1,770,000, which remains unpaid as a result of pending requests for information from winners as necessary for the Debtor to remit payment. In addition, uncashed prize checks paid from October 2024 to present total approximately $167,2667. The Debtor

estimates that lump sum prizes to be paid in the ordinary course of its business, consistent with past practices, during the thirty (30) days after the Petition Date on account of prepetition and post-petition lump sum prizes awarded, will total approximately $**152,000**.

61.     With respect to the Debtor's annuity-style prizes, some amounts are paid over a number of years, while others are paid for the duration of one, or in some cases two, lifetimes.  As of the Petition Date, the aggregate amount due to these prize winners over the next approximately sixty (60) years is approximately $26,000,000, discounted to present value at 11% per annum. Payments of approximately $1,872,425 will come due during 2025. Installments required to be paid to these prepetition winners within the next thirty (30) days, which the Debtor is seeking authority to pay, total approximately $**322,500**.

62.     The Debtor's Advertiser and User Acquisition Programs allow the Debtor to sell advertising space on its website and online social media platforms and purchase targeted advertising space likely to attract users. These programs are essential in that the Debtor's revenue is derived from its advertising and customer engagement. The Debtor is seeking authority to pay an aggregate amount of approximately $175,000 outstanding as of the Petition Date on account of the Debtor's Advertiser and User Acquisition Programs, with $**60,000** of such amount to be paid within the next (30) days.

63.     The Debtor's Marketing Programs consist of agreements allowing the Debtor to obtain upfront consideration in exchange for use of the Debtor's database analytics by third party brands, agencies, and technology partners, as well as arrangements whereby the Debtor pays vendors for marketing services designed to maintain and increase user engagement by existing customers. The Debtor is seeking authority to pay an aggregate amount of approximately $80,000

outstanding as of the Petition Date on account of essential Marketing Programs, with **$51,000** of such amounts to be paid within the next thirty (30) days.

64.     The Debtor is also seeking authority to make payments on account of refunds due to customers as they come due in the ordinary course, which total approximately $4,000 per week. Additionally, payments made on account of Refunds and Billing Adjustments since October 2024 which have not yet been cashed by the recipients as of the Petition Date total approximately $144,916. If and to the extent recipients of payments on account of Refund sand Billing Adjustments seek to cash their existing checks, the Debtor requests that such checks be honored. However, the Debtor estimates that refunds to be paid in the ordinary course of its business, consistent with past practices, during the thirty (30) days after the Petition Date on account of prepetition and postpetition refunds, will total approximately **$16,000**.

65.     In order to maintain continuity of these Customer Programs, the Debtor relies on certain critical vendors who provide internet service, maintain social media platforms, host websites and data, and perform related information technology services. These services are necessary to maintain the Debtor's Customer Programs, allowing customers to access and engage with the Debtor's digital marketplace. The Debtor is seeking authority to pay certain prepetition obligations to certain of these critical vendors totaling approximately $446,000, with **$184,455** to be paid within the next thirty (30) days.

66.     As further set forth in the Customer Programs Motion, I believe that the Debtor's viability depends upon maintaining its goodwill and reliability by continuing to honor its Sweepstakes and Contests and Refunds and Billing Adjustment practices. Additionally, failure to honor Customer Program Obligations relating to the Debtor's Advertiser and User Acquisition Programs and Marketing Programs would harm the Debtor's goodwill with its existing advertisers

and deter future advertisers from doing business with the Debtor, as well as slow user acquisition and customer engagement as necessary for the Debtor's continued operations. Finally, if the services provided by the vendors necessary to continue these Customer Programs were terminated, the Debtor's digital business and revenue stream would come to an immediate halt, irreparably harming value to the detriment of all parties in interest.

67. The Customer Program Obligations have been accounted for in the Debtor's Budget, attached hereto as Exhibit H, and the Debtor's future revenue projected thereunder relies upon the continuation of the Customer Programs. I believe that the Debtor will suffer immediate and irreparable harm absent the interim authority requested to be granted pursuant to the Customer Programs Motion.

### E.    Motion for Payment of Employee Wages and Related Compensation

68. The Debtor will be filing a motion seeking the entry of interim and final orders (i) authorizing, but not requiring, payment of prepetition wages, commissions, and employee benefits, (ii) authorizing and directing banks to honor checks with respect thereto, and (iii) authorizing, but not requiring, payment of postpetition wages and employee benefits (the "Employee Wage Motion").

69. The Debtor currently has 105 employees, of which 11 are Hourly Employees and 94 are Salaried Employees, some of which receive commissions.

70. As part of the Employee Wage Motion, the Debtor seeks entry of interim and final orders (i) authorizing, but not requiring, Debtor to pay, in its sole discretion, approximately $335,000, inclusive of the Prepetition Wages (which the Debtor believes is zero), Commissions (totaling approximately $100,000 in the aggregate owed to fifteen (15) of its Employees), Prepetition Payroll Administration Fees (totaling approximately $25,000), and the prepetition

costs related to the Employee Benefits (totaling approximately $210,000), including the Medical

Benefits Contribution, 401(k) Plan contribution, and Life Insurance Contribution.

71.     None of the amount proposed to be paid to any single Employee will exceed the

$17,150 priority cap in Section 507(a)(4) of the Bankruptcy Code.

72.     To avoid the significant risks of Employees refusing to continue to work for the

Debtor, discontent, or loss of morale among essential employees, and in view of the priority

awarded to wage claims, it is necessary and appropriate that the Debtor be granted the requested

authorization.

73.     The Debtor requires the continued services of the Employees to ensure the

continuity and quality of its business operations will not be threatened and so that the Debtor may

continue, without unnecessary interruption, its efforts to achieve a successful reorganization.

74.     Accordingly, by the Employee Wage Motion, the Debtor seeks authority pursuant

to sections 105(a) and 363(b) of the Bankruptcy Code authorizing the Debtor to pay Employee

Obligations and to continue, uninterrupted, its practices, programs, and policies with respect to its

Employees, as such practices, programs, and policies were in effect as of the Petition Date.

75.     I believe the relief requested in the Employee Wage Motion represents a sound

exercise of the Debtor's business judgment and is necessary to avoid immediate and irreparable

harm to the Debtor's estate.

76.     I understand the Debtor believes that without the relief requested in the Employee

Wage Motion, Employees may seek alternative employment opportunities, which would deplete

the Debtor's workforce and hinder the Debtor's ability to operate its business.

77.     I believe that the relief requested in the Employee Wage Motion is in the best

interest of the Debtor' estate, its creditors, and all other parties in interest and will facilitate the

Debtor's ability to operate its business in chapter 11 without disruption.

F.   **Motion to Continue Insurance Coverages**

78.     The Debtor will be filing a motion seeking the entry of interim and final orders (i) authorizing the Debtor to (a) continue insurance coverage entered into prepetition and continue its Surety Bond Program and satisfy prepetition obligations related thereto in the ordinary course of business and (b) renew, amend, supplement, extend, or purchase insurance coverage in the ordinary course of business on a postpetition basis (the "Insurance Motion").

79.     The Debtor is the beneficiary of various insurance policies administered by certain third-party insurance carriers.  Continuation and renewal of the Insurance Policies and entry into new insurance policies, as applicable, are essential to the preservation of the value of the Debtor's assets.  Moreover, in many instances, coverage provided by the Insurance Policies is required by the regulations, laws, and contracts governing the Debtor's commercial activities, including the requirement of the UST a debtor maintain adequate coverage given the circumstances of its chapter 11 case.

80.     Accordingly, the Debtor requests authority to pay outstanding amounts owed on account of Insurance Premiums (totaling approximately $23,000), including Insurance Brokerage Fees, owed in connection with the Insurance Policies as of the Petition Date and to continue to honor its obligations under the Insurance Policies as they come due in the ordinary course of business on a postpetition basis consistent with past practice.  The Debtor will owe $7,700 in Insurance Premiums that will be due and payable in the first thirty (30) days of the case.

81.     In the ordinary course of business, certain statutes, rules, contracts, and regulations require that the Debtor provides surety bonds to certain third parties, generally to governmental units or other public agencies, to secure the Debtor's payment or performance of certain

27

obligations (the "Surety Bond Program"). In accordance with applicable law, the Debtor registers all major sweepstakes in New York and Florida, supported by a Surety Bond in New York and subject to a bond waiver in Florida.

82.     As of the Petition Date, the Debtor owes approximately $1,200 on account of the Surety Premiums, a portion of which is attributable to Surety Brokerage Fees.

83.     As part of the relief requested in the Insurance Motion, the Debtor seeks authority to pay this amount and any other outstanding Surety Premiums, including Surety Brokerage Fees, owed in connection with the Surety Bonds as of the Petition Date and to continue to honor its obligations under the Surety Bond Program as they come due in the ordinary course of business on a postpetition basis consistent with past practice.

84.     To continue its business operations during this Chapter 11 Case in the State of New York, the Debtor must maintain the Surety Bond Program, including without limitation: (a) paying Surety Premiums as they come due; (b) renewing or potentially acquiring additional bonding capacity, as necessary, in the ordinary course of business; (c) canceling, revising, and/or supplementing Surety Bonds; (d) paying Surety Brokerage Fees as they come due; (e) replacing the Surety Broker as may be necessary; and (f) executing other agreements in connection with the Surety Bond Program. Accordingly, the Debtor requests authority to honor any amounts owed on account of the Surety Bonds, to continue the Surety Bond Program in the ordinary course of business, and to continue acquiring additional bonds to ensure that the Surety Bond Program and the Debtor's business operations remain uninterrupted on a postpetition basis.

85.     I believe that the relief requested in the Insurance Motion is in the best interest of the Debtor's estates, its creditors, and all other parties in interest and will facilitate the Debtor's ability to operate its business in chapter 11 without disruption.

### G.   Motion to Establish Procedures Relating to the Notice of Commencement, for an Extension of Time to File Schedules, and for Authority to Redact Personally Identifiable Information

86.     The Debtor will be filing a motion seeking the entry of an order order (i) extending the time within which the Debtor must file its Schedules and SoFA by 30 days, for a total of 44 days from the Petition Date, without prejudice to the Debtor's ability to request additional extensions, (ii) waiving the List Filing Requirements, (iii) authorizing the Debtor to redact in filed documents and file under seal the (a) the home addresses, email addresses and phone numbers of the Debtor's individual employees, prize winners and equity holders, and (b) the names of the annuity prize winners in the list of 20 largest unsecured creditors, and any other filed documents, and (iv) authorizing the Debtor to establish Commencement Procedures, including special noticing procedures for the Holders of Uncashed Checks (the "Notice of Commencement Motion").

87.     Given the critical matters that the Debtor's management and professionals were required to address prior to the commencement of the Bankruptcy Case, the Debtor was not in a position to complete the Schedules and SoFA as of the Petition Date.

88.     Omni has prepared a list of creditors and potential parties in interest (the "Creditor List") based on the names and addresses that the Debtor maintained in its database or were otherwise readily ascertainable by the Debtor before the Petition Date.  The Debtor will provide to the Clerk's Office shortly after the Petition Date an electronic copy of the Creditor List.  The Creditor list is in a format ordinarily used by Omni and might not comply with all or some of the various List Filing Requirements.

89.     Under the circumstances, reformatting the Creditor List, and otherwise complying with the List Filing Requirements will unnecessarily burden the Debtor, without any corresponding benefit to the Debtor's estate.  Accordingly, the Debtor requests that the Court waive the List Filing

Requirements and deem the Creditor List submitted to the Clerk's Office in electronic format sufficient.

90.     The Creditor List and Schedules and SoFA may contain the name, home addresses, email addresses and phone numbers of individuals, including the Debtor's employees and former employees, customers, prize winners, and equity security holders.  The Debtor seeks to redact and seal the home addresses, phone numbers and email addresses of all individuals and the names of annuity prize winners, because such information could be used, among other things, to harass, perpetrate identity theft, locate survivors of domestic violence or stalking who have otherwise taken steps to conceal their whereabouts, or otherwise inflict unlawful harm upon these individuals, particularly in light of the prize money the individual annuity prize winners have received or may be entitled to, which may increase their susceptibility to scams or harassment.

91.     The Debtor proposes to provide unredacted versions of all documents containing redactions to the Court, the UST, counsel to any official committee of unsecured creditors appointed in this Chapter 11 Case (if any), and other parties in interest upon Court order and subject to confidentiality arrangements satisfactory to counsel for the Debtor.

92.     To inform parties of the Bankruptcy Case and the section 341 meeting, the Debtor requests that Omni be authorized to serve by first class mail the Notice of Commencement to all equity security holders and creditors with the exception of the Holders of Uncashed Checks.

93.     The Debtor has identified hundreds of thousands of parties who failed to cash checks over the past five (5) years and therefore are creditors of the Debtor and would be entitled to the Notice of Commencement.

94.    As of the Petition Date, the Debtor owes various state agencies and individuals approximately $11,492,274.59 in Unclaimed Property representing approximately 757,484 checks that have not been cashed.

95.    State agencies responsible for administering the unclaimed property are general unsecured creditors with respect to any Unclaimed Property liabilities that have reached dormancy as of the Petition Date.  The Debtor has calculated the general unsecured claim amount due to these various state agencies at $5,048,929.69 in the aggregate.  Each state agency responsible for administering the Unclaimed Property liabilities will be listed on Schedule F and receive notices in the Chapter 11 Case.

96.    There are 368,411 checks for Unclaimed Property that were issued to approximately 297,942 individuals[3] that have not yet reached dormancy as of the Petition Date totaling $6,443,344.90 (collectively, the "Holders of Uncashed Checks").

97.    To mail the Notice of Commencement to the Holders of Uncashed Checks would cost the Debtor's estate approximately $381,365.76, consisting of postage of $0.73 and Omni's fees and expenses associated with the mailing at approximately $0.55 per package, for a total mailing cost per package of $1.28.

98.    Service by first-class mail on the Holders of Uncashed Checks would drain the Debtor's resources without producing a comparable benefit to the estate.  Therefore, the Debtor has considered other methods of providing notice to the Holders of Uncashed Checks other than a package sent via first class mail.

99.    The Debtor has email addresses for approximately 197,345 Holders of Uncashed Checks (collectively, the "Holders of Uncashed Checks with Email Addresses"), representing

---

[3] There is a difference in the amount of checks issued and amount of individuals involved because certain individuals received multiple uncashed checks.

approximately 66% of the Holders of Uncashed Checks.  The Debtor seeks authority to email the Holders of Uncashed Checks with Email Addresses the Email Notice informing them of the Debtor's bankruptcy filing and providing them with a link to the Notice of Commencement which will be available for viewing on the dedicated case website established by Omni (the "Case Website").[4]  The aggregate amount due to the Holders of Uncashed Checks with Email Addresses is approximately $4,332,248.21.

100.    The Debtor does not have email addresses for approximately 100,597 Holders of Uncashed Checks (collectively, the "Holders of Uncashed Checks Without Email Addresses"). The aggregate amount due to the Holders of Uncashed Checks without Email Addresses is approximately $2,111,096.69.   Approximately 76.73% of the Holders of Uncashed Checks Without Email Addresses have failed to cash Refund Checks, approximately 23.26% of the Holders of Uncashed Checks Without Email Addresses have failed to cash Winner Checks, and the remaining .01% of the Holders of Uncashed Checks Without Email Addresses are vendors who failed to cash checks (collectively, the "Vendor Checks").

101.    Below is a summary of the Refund Checks owed to the Holders of Uncashed Checks Without Email Addresses:

| | |
|---|---|
| Aggregate Amount of Refund Checks: | $1,854,856.09 |
| Number of Parties Owed Refund Checks: | 77,185 |
| Lowest Refund Check Amount: | $0.10 |
| Highest Refund Check Amount: | $5,743.42 |
| Average Refund Check Amount: | $24.03 |
| Number of Refund Checks Below $100 | 73,968 |
| Number of Refund Checks Between $100 and $999.99 | 3,189 |
| Number of Refund Checks Between $1,000 and $5,743.42 | 28 |

102.    Below is a summary of the Winner Checks owed to the Holders of Uncashed

---

[4] The Debtor is not able to email a PDF copy of the Notice of Commencement due to limitations with its email service provider.

Checks Without Email Addresses:

| | |
|---|---|
| Aggregate Amount of Winner Checks: | $255,530.54 |
| Number of Parties Owed Winner Checks: | 23,401 |
| Lowest Winner Check Amount: | $5.00 |
| Highest Winner Check Amount: | $5,000.00 |
| Average Winner Check Amount: | $10.92 |
| Number of Winner Checks Below $100 | 23,143 |
| Number of Winner Checks Between $100 and $999.99 | 242 |
| Number of Winner Checks Between $1,000 and $5,000.00 | 6 |

103.    Below is a summary of the Vendor Checks owed to the Holders of Uncashed Checks Without Email Addresses:

| | |
|---|---|
| Aggregate Amount of Vendor Checks: | $710.06 |
| Number of Parties Owed Vendor Checks: | 11 |
| Lowest Vendor Check Amount: | $0.50 |
| Highest Vendor Check Amount: | $243.08 |
| Average Vendor Check Amount: | $64.55 |
| Number of Vendor Checks Below $100 | 9 |
| Number of Vendor Checks Between $100 and $243.08 | 2 |

104.    For those Holders of Uncashed Checks Without Email Addresses, the Debtor seeks authority to mail a postcard to those parties who have outstanding Refund Checks, Winner Checks, and Vendor Checks in the amount of at least $100 (the "$100 Threshold for Holders of Uncashed Checks Without Email Addresses").  There would be approximately 3,477 parties who would receive postcards because they fall within the $100 Threshold for Holders of Uncashed Checks Without Email Addresses, at a cost of approximately $2,433.90, consisting of postage of $0.45 and Omni's fees and expenses associated with the mailing at approximately $0.25 per postcard, for a total mailing cost per postcard of $0.70.

105.    The Debtor seeks authority to mail a 4" x 6" postcard containing the material information set forth in the Notice of Commencement via first class presort postage.  The Postcard Notice will include a QR code (quick-response code) linking the reader directly to Omni's Case Website, which will provide (i) access to the Notice of Commencement, (ii) an option to receive

future notices via email, and (iii) access to other critical information about the chapter 11 Case, including the public docket.

106.    This would leave 97,120 Holders of Uncashed Checks Without Email Addresses who have outstanding Refund Checks, Winner Checks, and Vendor Checks less than $100 (the "Holders of Uncashed Checks Without Email Addresses Owed Less than $100"). To mail a postcard to these parties would cost the Debtor approximately $67,984. Rather than mail a postcard to these parties, the Debtor seeks authority to publish the Notice of Commencement in the national edition of USA Today (the "Publication Notice").

107.    The Debtor believes that Publication Notice is the most efficient and cost-effective manner by which service of all Holders of Uncashed Checks Without Email Addresses Owed Less than $100 can be completed, and it is also the most likely to facilitate responses. Given that the Debtor previously sent checks to the Holders of Uncashed Checks Without Email Addresses Owed Less than $100 to the address in the Debtor's books and records and such checks were not cashed, the Debtor believes that the party has either (i) moved or (ii) in the case of an individual, passed away, and the in case of a company, dissolved. Therefore, even if the Debtor mailed a postcard to these parties, it is highly unlikely they would actually receive it.

108.    The Debtor believes that the combination of the Email Notice, Postcard Notice, and Publication Notice is the most practical method by which to notify the Holders of Uncashed Checks of the commencement of this chapter 11 case and constitutes an efficient use of the estate's resources.

109.    I believe that the relief requested in the Notice of Commencement Motion is in the best interest of the Debtor's estates, its creditors, and all other parties in interest and will facilitate the Debtor's ability to operate its business in chapter 11 without disruption.

34

## VII.   **Additional Motions**

110.   On or shortly after the Petition Date, the Debtor intends to file the following additional motions and applications. The Debtor will file additional motions as necessary after the Petition Date in connection with the administration of the Chapter 11 Case.

### a.   **Motion to Authorize Retention and Compensation of Professionals Utilized in the Ordinary Course of Business**

111.   In the ordinary course of its business, the Debtor retains various attorneys and financial professionals to provide legal advice and financial services in a variety of matters unrelated to this Bankruptcy Case, including with respect to specialized areas of real estate, labor and employee benefits law, intellectual property, litigation, advertising and consumer protection, and consumer privacy and data protection.  Due to the number of ordinary course professionals regularly retained by the Debtor, I believe it would be unwieldy and burdensome to the Debtor and the Court to request that each such professional apply separately for approval of its employment and compensation.  While some such professionals may wish to continue to represent the Debtor on an ongoing basis, others may be unwilling to do so if the Debtor cannot pay them on a regular basis.  These professionals have the background knowledge of the Debtor and its operations such that replacing such professionals would be unnecessarily expensive and inefficient.  I therefore believe that the motion is in the best interest of the Debtor and its estate.

### b.   **Retention of Bankruptcy Professionals**

112.   On or after the Petition Date, the Debtor intends to file applications seeking to retain the following professionals to provide professional services or legal advice to the Debtor with respect to this Bankruptcy Case, subject to Bankruptcy Court approval.   The following professionals have had significant experience in the fields for which the Debtor intends to employ them.

i.  Klestadt Winters Jureller Southard & Stevens, LLP as bankruptcy counsel to the Debtor;

ii.  Getzler Henrich & Associates LLC, as CRO to provide restructuring management services;

iii.  SSG Advisors, LLC, as investment banker; and

iv.  Omni Agent Solutions, Inc. as claims and noticing agent and administrative agent

c.  **Motion for Approval of Interim Compensation Procedures**

113.    The Debtor requests authority to establish procedures for the interim compensation and reimbursement of expenses for professionals and members of any official committees and ombudsman appointed in this Bankruptcy Case.  I believe that establishing orderly procedures for addressing issues related to payment of such professionals will streamline the administration of the Bankruptcy Case and otherwise promote efficiency for the Court, the United States Trustee, and all parties in interest.  The relief requested in the motion will also permit the Debtor to efficiently manage payments to such professionals and allow all parties to appropriately monitor the costs of administration of the Debtor's Bankruptcy Case.  Accordingly, I believe the motion is in the best interests of the Debtor and its estate.

## VIII.    Additional Information Required by Local Rule 1007-2(a) and (b)

### A.    Debtor's Business and Events Leading to the Chapter 11 Filing

114.    The information requested in Local Rule 1007-2(a)(1) is set forth in Sections A-B above.

### B.    Bankruptcy Case Was Not Originally Commenced Under Chapter 7

115.    The Bankruptcy Case was voluntarily commenced under Chapter 11 of the Bankruptcy Code.  Accordingly, Local Rule 1007-2(a)(2) is inapplicable.

**C.    No Prepetition Creditors Committee**

116.    In accordance with Local Rule 1007-2(a)(3), to the best of the Debtor's knowledge, no pre-petition creditors committee has been formed.

**D.    Holders of the Twenty (20) Largest Unsecured Claims**

117.    In accordance with Local Rule 1007-2(a)(4), a list setting forth the top twenty (20) general unsecured creditors of each Debtor, excluding those persons who constitute "insiders" under Bankruptcy Code Section 101(31) of the Debtor is attached as **Exhibit B**.  As required by Local Rule 1007-2(a)(4), Exhibit B includes the creditors' names, addresses, telephone numbers (for persons familiar with the account, if available), amount of each claim, and an indication of whether the claims are contingent, unliquidated, disputed or partially secured.

**E.    Holders of the Five Largest Secured Claims**

118.    In accordance with Local Rule 1007-2(a)(5), a list setting forth each of the Debtor's five (5) largest secured creditors is annexed hereto as **Exhibit C**.  As required by Local Rule 1007-2(a)(5), Exhibit C includes the creditors' names, addresses, amount of each claim, a description and an estimate of the value of the collateral securing the claim, and whether the claim or lien is disputed.

**F.    Summary of the Debtor's Assets and Liabilities**

119.    As required by Local Rule 1007-2(a)(6), a summary of the Debtor's assets and liabilities as of the Petition Date is annexed hereto as **Exhibit D**.

**G.    Publicly Held Securities**

120.    As required by Local Rule 1007-2(a)(7), the Debtor has no classes of shares of stock, debentures, or other securities of the Debtor that are publicly held.

### H.   Property Held by Others

121.   As required by Local Rule 1007-2(a)(8), to the best of my knowledge, there is no property of the Debtor in the custody of any public officer, receiver, trustee, pledgee, assignee of rents, liquidator, secured creditor or agents of any such person.

### I.   Debtor's Premises

122.   As required by Local Rule 1007-2(a)(9), **Exhibit E** contains a list of each of the premises owned, leased or held under any other arrangement from which the Debtor operates its business.

### J.   Location of the Debtor's Assets and Books and Records

123.   Pursuant to Local Rule 1007-2(a)(10), the majority of the Debtor's hard copy books and records are maintained at the Debtor's New York City office and the storage facility in Bethpage.  The Debtor's digital files are stored with Crown Castle.

### K.   Pending or Threatened Actions Against the Debtor

124.   Pursuant to Local Rule 1007-2(a)(11), **Exhibit F** contains a schedule identifying the nature and present status of pending or threatened actions against the Debtor.

### L.   Debtor's Senior Management

125.   In accordance with Local Rule 1007-2(a)(12), **Exhibit G** contains a schedule which provides the names of the individuals who constitute the Debtor's senior management, their tenure with the Debtor and a brief summary of their responsibilities and relevant experience as of the Petition Date.

### M.   Debtor's Employees and Consultants

126.   The Debtor currently has 105 employees, of which 11 are hourly employees (the "Hourly Employees") and 94 are salaried employees (the "Salaried Employees"), some of which

receive commissions. Pursuant to Local Rule 1007-2(b)(1), for the thirty (30) day period following the Petition Date, the Debtor intends to pay employees (exclusive of officers, directors, stockholders, partners, and members) approximately $1,329,000.

127.    Pursuant to Local Rule 1007-2(b)(2)(A), for the thirty (30) day period following the Petition Date, the Debtor intends to pay officers and directors approximately $375,000.

128.    Pursuant to Local Rule 1007-2(b)(2)(C), the Debtor has retained Getzler Henrich & Associates LLC as CRO and SSG Capital Advisers as investment banker.  For services to be rendered during the thirty (30) day period following the Petition Date, the Debtor intends to pay these consultants and others approximately $375,000.

### N.    Cash Receipts and Disbursements

129.    Pursuant to Local Rule 1007-2(b)(3), the following provides a schedule of estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue but remain unpaid for the thirty (30) days following the Petition Date:

| Type | Amount |
|---|---|
| Cash Receipts (fee income due) | $3,500,000 |
| Cash Disbursements (payroll, insurance, consultants, other operating expenses) | $4,500,000 |
| Net Cash Gain or Loss | $(1,000,000) |
| Unpaid Obligations (excluding professional fees and excluding amounts under contracts and leases sought to be rejected) | $0 |
| Unpaid Receivables | $2,800,000 |

### <u>Conclusion</u>

130.    The Debtor reserves the right to amend or supplement any of the schedules annexed hereto as exhibits in the event additional information is obtained by the Debtor during the course of these proceedings.

131.   The Debtor believes that the protections afforded in the Bankruptcy Code will enable the Debtor to maximize value for its creditors and its estate as it restructures its operations in order to emerge as a more streamlined, efficient and modern business capable of continuing its iconic sweepstakes for the benefit of former and future prize winners and providing employment opportunities to current and future employees.

[Signature Page Follows]

I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Dated:  April 9, 2025

_/s/ William H. Henrich_

Name: William H. Henrich
Title: Co-Chief Restructuring Officer

Signature Page to Rule 1007 Declaration

**<u>Exhibit A</u>**

**Corporate Organizational Structure**

(*See attached*)

# PUBLISHERS CLEARING HOUSE LLC ORGANIZATION CHART



**PUBLISHERS CLEARING HOUSE LLC – (New York)**
**(Debtor)**

WOM, Inc. – (Texas)
100%  PCH
Acquired 8/2020
C-Corp (inactive)
(Non-Debtor)

Publishers Clearing House
Inc. – (New York)
100%  PCH (inactive)
(Non-Debtor)

Publishers Clearing
House Limited – (U.K.)
100%  PCH (inactive)
(Non-Debtor)

Funtank LLC 100%  PCH
(12/2010) Single member,
disregarded entity
(inactive)
(Non-Debtor)

Publishers Clearing House
Media LLC – (Delaware)
100% PCH Single member,
disregarded entity
(inactive)
(Non-Debtor)

## **Exhibit B**

**Debtor's Top Twenty Unsecured Creditors[5]**

---

[5] Amounts are estimated and subject to adjustment and may be subject to offset. Inclusion of any amount is not an admission of liability.

**Fill in this information to identify the case:**

| | |
|---|---|
| Debtor name | **Publishers Clearing House LLC** |
| United States Bankruptcy Court for the: | **SOUTHERN DISTRICT OF NEW YORK** |
| Case number (if known): | _____ |

☐ Check if this is an

amended filing

## Official Form 204

### Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders

12/15

A list of creditors holding the 20 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. Do not include claims by any person or entity who is an insider, as defined in 11 U.S.C. § 101(31).  Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 20 largest unsecured claims.

| Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| **AGW PARENT/AG-WERE 300 JERICHO LLC Tony Fromer 100 JERICHO QUADRANGLE, SUITE 116 Jericho, NY 11753** | **Tony Fromer** **afromer@were.com** **516-931-5300** | **Unpaid rent and related charges through lease termination and lease rejection damages cap** | **Contingent Unliquidated** | | | $13,036,023.71 |
| **Senior Midwest Direct, Inc. d/b/a Jetson Mailers 1005 101st Street, Suite A Lemont, IL 60439** | **Richard Carosella Jr.** **rmc@jetsonmailers.com** **331-318-7300** | **Damages for purported breach of contract** | **Disputed** | | | $3,291,778.83 |
| ██████████ | ██████████ | **Prize Winner 1** | | | | $2,665,324.40 |
| ██████████ | ██████████ | **Prize Winner 13** | | | | $2,418,551.12 |
| ██████████ | ██████████ | **Prize Winner 15** | | | | $2,417,620.00 |
| ██████████ | ██████████ | **Prize Winner 21** | | | | $2,414,231.31 |
| ██████████ | ██████████ | **Prize Winner 23** | | | | $2,412,867.59 |

Debtor    **Publishers Clearing House LLC**
_____
Name

Case number *(if known)* _____

| Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| ███████████ | ███████████ | Prize Winner 29 | | | | $2,360,625.96 |
| ███████████ | ███████████ | Prize Winner 25 | | | | $2,346,360.00 |
| ███████████ | | Prize Winner 30 | | | | $2,109,901.45 |
| UPS EXPEDITED MAIL SERVICES DBA: UPS MAIL INNOVATIONS INC 55 GLENLAKE PKWY NE, Luis Javier Gil Atlanta, GA 30328 | Luis Javier Gil luisjaviergil@ups.com 866-723-5263 x1351064 | Trade debt | | | | $2,089,000.57 |
| Nassau County Industrial Development Agency, 1550 Franklin Avenue Suite 235, Attn: Executive Director Mineola, NY 11501 | Sheldon L. Shrenkel, CEO info@nassauida.org 516-571-1945 | Recapture of benefits under Project Agreement | Contingent Unliquidated | | | $1,760,796.68 |
| ███████████ | ███████████ | Prize Winner 4 | | | | $1,048,275.15 |
| ███████████ | ███████████ | Prize Winner 16 | | | | $968,263.76 |
| PITNEY BOWES GLOBAL ECOMMERCE, NEWGISTIC Amy Tucker 27 WATERVIEW DRIVE Shelton, CT 06484 | Amy Tucker amy.tucker@pb.com 919-412-4485 | Trade debt | | | | $922,417.17 |
| California State Controller's Office 300 Capitol Mall, Suite 1850 Sacramento, CA 95814 | Gary Gervin ggervin@sco.ca.gov 916-464-6144 | Unclaimed funds | | | | $581,621.15 |

Debtor    **Publishers Clearing House LLC**

Case number *(if known)*

Name

| Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| **IRG REALTY ADVISORS LLC St. Cloud Business Park LLC, Dawn Cragon 4020 Kinross Lakes Pkwy, #200 Richfield, OH 44286** | **Anne Donahue** adonahue@irgra.com 507-540-0562 | **Amounts due under lease** | | | | $497,058.00 |
| **Leader Properties LLC 100 Commercial Street Portland, ME 04101** | **Marsie Collins** mcollins@eastbrowncow.com 207-775-2252 | **Guaranty of Portland, Maine Lease** | **Contingent Unliquidated** | | | $383,164.54 |
| **ROYAL DE REE HOLLAND BV LISSERBROEKERW EG 60 HOLLAND, 216GBG** | **Boy De Ree** sales@royal-deree-holland.com +31 (0)252 417751 | **Trade debt** | | | | $378,966.55 |
| **INTERNATIONAL BUSINESS MACHINES CORP. 3039 E Cornwalis Road Durham, NC 27709** | **Joe Rokosz** Joe.Rokosz@cdw.com 631-656-9167 | **Trade debt** | | | | $354,237.55 |

**Exhibit C**

**Five Largest Secured Claims**

| Name of Creditor and Complete Mailing Address | Amount of Claim | Value and Description of Collateral | Indicate if Claim is Contingent, Unliquidated, or Disputed |
|---|---|---|---|
| Nassau County Industrial Development Agency | Undetermined | Property located at Jericho premises | |
| IBM Credit LLC | Undetermined | Office equipment and related software | Disputed |
| Dell Financial Services LLC | Undetermined | Computer equipment | Disputed |

Exhibit C - 1

## Exhibit D

### Summary of the Debtor's Assets and Liabilities

The following are estimates of the Debtor's total assets and liabilities.  The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtor. The Debtor reserves all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt.[6]

| Assets and Liabilities | Amount (Approximate) |
| --- | --- |
| Total Assets (Book Value) | $11,673,000 |
| Total Liabilities (Book Value) | $65,678,566 |

---

[6] These amounts are estimated as of March 31, 2025 and will be updated to estimates as of the Petition Date in the Debtor's schedules and statement of financial affairs to be filed with the Court.

## **Exhibit E**

### **List of Premises**

| Location | Interest | Use | Debtor's Intention |
|---|---|---|---|
| 7 West 22nd Street 10th Floor New York, New York 10010 | Tenant – Leasehold Interest | Office Space | The Debtor intends to retain this lease for the current time. |
| Portion of 1-15 Grumman Road West Bethpage, New York 11714 | Tenant – Leasehold Interest | Storage Facility | The Debtor intends to retain this lease for the current time. |
| 66 Pearl Street Suites 300, 301, 320, 321, 322 and mezzanine Portland, Maine 04101 | Tenant – Leasehold Interest | Office Space | The Debtor intends to reject this lease as of the Petition Date, subject to Bankruptcy Court approval.[7] |
| 300 Jericho Quadrangle Suites 170, 180, 210, 300 and LL02 Jericho, New York 11753 | Tenant – Leasehold Interest | Office Space | The Debtor intends to reject this lease as of the Petition Date, subject to Bankruptcy Court approval. |

---

[7] While the Debtor is not the technically the "Tenant" under this Lease, it will be seeking to reject this lease out of an abundance of caution in the event the Debtor is deemed to be the "Tenant" as a result of the dissolution of the tenant under the lease, Liquid Wireless, LLC.

**Exhibit F**

**List of Pending Legal or Administrative Proceedings**

| Case Name & Case No. | Status |
|---|---|
| Mary Lou Pett, et al. vs. Publishers Clearing House, Inc., Case No. 2:22-cv-11389-DPH-EAS (U.S. District Court, Eastern District of Michigan, Southern Division) | Putative Class Action filed in June 2022 under the Michigan Preservation of Privacy Act. Discovery schedule entered. |
| Senior Midwest Direct (Jetson Mailers) v. Publishers Clearing House LLC, Civil Action No. 24-cv-9925 (U.S. District Court, Southern District of New York) | Complaint filed on December 24, 2024. Debtor's answer filed on March 19, 2025. Initial conference scheduled for April 11, 2025. |
| Cottage Hill Nursery, Inc. v. Publishers Clearing House LLC, Civil Action No. 02-CV-2025-900753.00 (Circuit Court, Civil Div., Mobile County, Alabama) | Complaint filed on March 28, 2025. No Answer filed. Alleged breach of contract. |
| Publishers Clearing House LLC v. United States of America; Office of the United States Trade Representative; Robert E. Lighthizer, U.C. Trade Representative; U.S. Customs & Border Protection; Mark A. Morgan, U.S. Customs & Border Protection Acting Commissioner, Court No. 20-01415, United States Court of International Trade | Case concerns the unlawful actions of Defendants in escalating the trade war with China through the imposition of a third round of tariffs under what has colloquially been identified as "List 3" and a fourth round of tariffs under what has colloquially been identified as "List 4". The Debtor seeks, among other things, refunds, with interest, of any duties paid by the Debtor pursuant to List 3 and List 4. |
| Michelle Dank v. Publishers Clearing House LLC, Index No. 607437/25 (N.Y. Sup. Ct., Nassau County) | Complaint filed on April 7, 2025 alleging employment related damages. No Answer filed. |

## Exhibit G

### The Debtor's Senior Management

| Name/Position | Relevant Experience/Responsibilities |
|---|---|
| Andrew C. Goldberg, Director and Chairman, President and Chief Executive Officer | As CEO and Chairman of the Board of Directors, Andy Goldberg is leading PCH's multi-year transition as the Debtor continues to pivot towards an identity and a data driven advertising business. He is dedicated to bringing in top media talent to align with the Debtor's new focus - aimed at creating incremental shareable data based on Debtor's unique value proposition and unparallel ability to generate pure audience authentication, permissioned 1st party data and tremendous user engagement. Andy has led PCH through several successful transformations, including acquisitions in the online search, casual games, and mobile advertising markets. |
| Adam Sokoloff, Director and Chief Financial Officer | As Chief Financial Officer and Board Member, Adam Sokoloff is the primary financial strategist for the Debtor, responsible for developing and defining the company's overall business and financial strategy to support optimal decision-making. He focuses on ensuring strong cash preservation and driving the accelerated growth of the Debtor's media's identity and data-led advertising business, guiding the successful transition from legacy direct mail to digital channels to increase the company's value. He also collaborates with finance leaders to enhance financial management and oversee investments in growth opportunities. With expertise in capital markets and digital strategies, he helps manage costs, fuel growth, and create value for the Debtor's shareholders. |
| Sameer Deen, Director | The Director's role includes ensuring the Debtor's strategy aligns with shareholder interests and supporting the CEO in developing and evolving the company's transformation. Directors oversee the effectiveness of the management team, financial planning, privacy protections, and cybersecurity. They ensure the company has solid operating and capital plans, competitive compensation practices, and a healthy board culture focused on collaboration and trust. Directors contribute creative ideas and provide strategic guidance, ensuring decisions are in the company's best interest. |
| Peter Derow, Director | The Director's role includes ensuring the Debtor's strategy aligns with shareholder interests and supporting the CEO in developing and evolving the company's transformation. Directors oversee the effectiveness of the management team, financial planning, privacy protections, and cybersecurity. They ensure the company has solid operating and capital plans, competitive compensation practices, and a healthy board culture focused on collaboration and trust. Directors contribute creative ideas and provide strategic guidance, ensuring decisions are in the company's best interest. |

| Name/Position | Relevant Experience/Responsibilities |
|---|---|
| Lauren Stanich, Director | The Director's role includes ensuring the Debtor's strategy aligns with shareholder interests and supporting the CEO in developing and evolving the company's transformation. Directors oversee the effectiveness of the management team, financial planning, privacy protections, and cybersecurity. They ensure the company has solid operating and capital plans, competitive compensation practices, and a healthy board culture focused on collaboration and trust. Directors contribute creative ideas and provide strategic guidance, ensuring decisions are in the company's best interest. |
| Craig S. Anderson, Senior Vice President, Operations and Marketing Services | As Senior Vice President & Chief Transformation Officer, Craig Anderson leads the Debtor through periods of change, innovation, and growth, overseeing all aspects of transformation. He works closely with the Executive Team to identify opportunities, create actionable strategies, and drive successful implementation. He delivers results across the organization, focusing on operational efficiency, growth initiatives, product strategy, and development of high performing teams. |
| Michael E. Cooper, Vice President, Finance and Controller | As Vice President of Finance, Michael Cooper serves as a strategic partner, driving business transformation, financial strategy, and shareholder value through the expansion of the Debtor's identity and data-driven ad business. He oversees treasury functions, financial planning and analysis, M&A activities, and investment initiatives. He also leads operational efficiencies, revenue forecasting, and strategic investments to support long-term profitability and growth. |
| Christopher Irving, Vice President, Consumer and Legal Affairs | As Vice President of Consumer and Legal Affairs, Chris Irving is responsible for managing the Debtor's brand reputation, including overseeing all consumer affairs inquiries. He ensures exemplary resolutions for consumer concerns and works proactively to engage key audiences through outreach and education. Known for his anti-scam efforts, he has become a trusted industry resource in the fight against consumer fraud. |
| Kevin Prinz, Senior Vice President and Chief Technology Officer | As Chief Technology Officer, Kevin Prinz has built the technological framework that drives PCH's growth and business evolution. He leads a team of technology experts, onsite and offshore, managing everything from backend systems to customer-facing platforms, with a focus on big data initiatives and overseeing 100 million customer profiles. With over 20 years of experience, he excels in leveraging data and delivering innovative solutions across all digital platforms. |
| Salvatore Tripi, Vice President, Digital Operations and Compliance | As Vice President of Digital Operations and Compliance, Sal Tripi is responsible for leading privacy, compliance, data security, and online operations, implementing innovating programs that protect data while supporting business growth. With expertise in eCommerce, Ad Tech, and marketing, he develops strategies that align regulatory needs with |

| Name/Position | Relevant Experience/Responsibilities |
|---|---|
|  | operational efficiency. A dynamic leader, he bridges technology and business, driving collaboration to mitigate risk and enhance efficiency and support scalable growth. |

## **Exhibit H**

**Budget**

**Publishers Clearing House LLC**
Weekly Cash Flow Budget - $ in 000's

| | | Month | April | | | | May | | | | June | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Week Ended | 4/11 | 4/18 | 4/25 | 5/2 | 5/9 | 5/16 | 5/23 | 5/30 | 6/6 | 6/13 | 6/20 | 6/27 | 7/4 |
| | | Forecast Week | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| **Cash Receipts** | | | | | | | | | | | | | | | |
| 1.) | B2B Collections (a) | | 36 | 97 | 61 | 29 | 73 | - | - | - | - | - | - | - | - |
| 2.) | Factored Pre-Petition A/R | | - | 1,873 | 67 | 67 | 67 | 67 | 2,390 | 67 | - | - | - | 124 | 124 |
| 3.) | Factored Post-Petition A/R | | - | 607 | - | - | 864 | - | 1,180 | - | 970 | - | 1,256 | 90 | 1,069 |
| 4.) | B2C Collections (b) | | 45 | 123 | 78 | 37 | 56 | 27 | 74 | 69 | 37 | 18 | 49 | 46 | 5 |
| 5.) | **Total Receipts** | | **81** | **2,700** | **205** | **132** | **1,059** | **94** | **3,643** | **135** | **1,007** | **18** | **1,305** | **259** | **1,197** |
| **Cash Disbursements** | | | | | | | | | | | | | | | |
| | **Operational Disbursements** | | | | | | | | | | | | | | | |
| 6.) | A/P Payments (c) | | - | (598) | - | (5) | (297) | (327) | (247) | (262) | (312) | (262) | (305) | (342) | (739) |
| 7.) | Payroll (d) | | - | (387) | (387) | (387) | (387) | (387) | (387) | (537) | (387) | (387) | (387) | (387) | (387) |
| 8.) | Other (e) | | (15) | (15) | (15) | (15) | (15) | (15) | (15) | (15) | (15) | (15) | (15) | (15) | (15) |
| 9.) | Lump Sum Winner Payments (f) | | (34) | (34) | (34) | (50) | (46) | (46) | (46) | (46) | (46) | (46) | (46) | (46) | (34) |
| 10.) | **Total - Operational Disburse.** | | **(49)** | **(1,033)** | **(435)** | **(457)** | **(745)** | **(775)** | **(695)** | **(860)** | **(760)** | **(710)** | **(753)** | **(790)** | **(1,175)** |
| | **Chapter 11 Disbursements** | | | | | | | | | | | | | | | |
| 11.) | Professional Fees (g) | | (34) | (59) | (59) | (59) | (61) | (61) | (206) | (69) | (76) | (76) | (181) | (76) | (69) |
| 12.) | Critical Vendor Payments (h) | | - | - | (295) | - | - | - | (203) | - | - | - | (203) | - | - |
| 13.) | US Trustee Fees | | - | - | - | - | - | - | - | - | - | - | - | - | (64) |
| 14.) | **Total - Chapter 11 Disburse.** | | **(34)** | **(59)** | **(354)** | **(59)** | **(61)** | **(61)** | **(409)** | **(69)** | **(76)** | **(76)** | **(384)** | **(76)** | **(133)** |
| 15.) | **Total Disbursements** | | **(82)** | **(1,092)** | **(790)** | **(516)** | **(806)** | **(836)** | **(1,104)** | **(929)** | **(836)** | **(786)** | **(1,137)** | **(866)** | **(1,308)** |
| 16.) | **Net Cash Flow** | | **(1)** | **1,607** | **(584)** | **(384)** | **254** | **(742)** | **2,540** | **(794)** | **171** | **(768)** | **168** | **(607)** | **(111)** |
| **Cash Balance** | | | | | | | | | | | | | | | |
| 17.) | Beginning Cash Balance | | 65 | 64 | 1,671 | 1,087 | 703 | 956 | 215 | 2,754 | 1,960 | 2,131 | 1,363 | 1,531 | 924 |
| 18.) | Net Cash Flow | | (1) | 1,607 | (584) | (384) | 254 | (742) | 2,540 | (794) | 171 | (768) | 168 | (607) | (111) |
| 19.) | **Ending Cash Balance** | | **64** | **1,671** | **1,087** | **703** | **956** | **215** | **2,754** | **1,960** | **2,131** | **1,363** | **1,531** | **924** | **814** |

Notes:
a) Collection of non-factorable receivables aged 90+ days.
b) Collection agency inflow from written off consumer receivables.
c) Includes post-petition operating expenses including ordinary course professionals and annuity prize winners.
d) Includes quarterly commissions payable weeks ending May 30th and August 29th.
e) Includes uncashed prize winner checks, potential consumer refunds and other expenses.
f) Payments for recent lump sum prize winners.
g) Debtor's professionals and UCC counsel fees escrowed weekly, to be paid subsequent to Court approved fee applications. Also includes non-escrowed consumer privacy ombudsman, public relations and claims management fees, paid quarterly subsequent to Court approval.
h) Includes critical vendor and other payments as per Schedule 1 of the Customer Program Motion.