# Exhibit B

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT.**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
--------------------------------------------------------x
In re                                                   :
                                                        :      Chapter 11
PUBLISHERS CLEARING HOUSE 382 Channel                   :      Case No. 25-10694 (MG)
Drive LLC,                                              :
f/k/a Publishers Clearing House LLC,                    :
                                                        :      Case No. 25-10694 (MG)
                        Debtor.                          :
--------------------------------------------------------x
```

**AMENDED DISCLOSURE STATEMENT FOR AMENDED PLAN OF LIQUIDATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**KLESTADT WINTERS JURELLER**
**SOUTHARD & STEVENS, LLP**
200 West 41st Street, 17th Floor
New York, New York 10036
Tel: (212) 972-3000
Fax: (212) 972-2245
Tracy L. Klestadt
Lauren C. Kiss
Stephanie R. Sweeney
Andrew C. Brown

*Counsel to 382 Channel Drive LLC, f/k/a*
*Publishers Clearing House LLC, Debtor*
*and Debtor-in-Possession*

Dated: New York, New York
        August 8 October 22, 2025

**TABLE OF CONTENTS**

I.     PURPOSE AND LIMITATIONS OF DISCLOSURE STATEMENT .........................1

   A.  Purpose of Disclosure Statement ................................................................1

   B.  Definitions and Exhibits ...........................................................................1

        1.  Exhibits .........................................................................................1

   C.  Enclosures ...............................................................................................2

   D.  Representations and Limitations.................................................................2

   E.  Important Dates........................................................................................3

   F.  Solicitation Procedures .............................................................................4

   G.  Recommendation ......................................................................................4

   H.  Inquiries ..................................................................................................4

II.    BACKGROUND ...........................................................................................5

   A.  Corporate and Ownership Structure............................................................5

   B.  The Debtor's Business ...............................................................................5

        1.  Overview ........................................................................................5

        2.  Original Founding ..........................................................................5

        3.  Sweepstakes ~~Introduction .......................................................6~~Introduction .........................................................................................5

        4.  Prize Patrol Creation ......................................................................6

        5.  Moving Beyond Magazines/Diversification........................................6

        6.  Digital Transition ...........................................................................6

        7.  The Debtor's Operations and Revenue ..............................................7

III.   SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASE ................................8

   A.  Retention of Professionals .........................................................................8

i

B.  Schedules of Assets and Liabilities, Statement of Financial Affairs ............................9

C.  Creditor Claims and the Bar Date for Filing of Claims Arising Prior to the Petition
Date ...................................................................................................................................9

D.  Debtor-in-Possession Financing .......................................................................................10

E.  Sale of Substantially All of the Debtor's Assets and Repayment of DIP Facility.......10

F.  Rejection of Executory Contracts and Unexpired Leases............................................11

IV.    SUMMARY OF THE PLAN OF LIQUIDATION ....................................................12

A. General Plan Objectives.....................................................................................................12

B.  Provisions Governing Order and Method for Distributions Under the Plan ..............12

C.  Classes of Claims................................................................................................................12

    1.  Administrative Expense Claims...................................................................................13

    2.  Priority Tax Claims.......................................................................................................13

    3.  Professional Fee Claims................................................................................................14

    4.  Ordinary Course Professional Claims..........................................................................15

    5.  Class 1 (Secured Claims) .............................................................................................16

    6.  Class 2 (Priority Non-Tax Claims) ..............................................................................16

    7.  Class 3 (General Unsecured Claims) ...........................................................................16

    8.  Class 4 (Equity Interests).............................................................................................18

V.    MEANS OF IMPLEMENTING THE PLAN.............................................................18

A.  Plan Funding .......................................................................................................................18

B.  Appointment of Plan Administrator.................................................................................18

    1.  Appointment of Plan Administrator..............................................................................18

    2.  Bond..............................................................................................................................18

ii

3. Governance ..................................................................................... 18

4. Succession Matters .......................................................................... 18

5. Funding of Plan Administrator's Activities ..................................... 19

6. Indemnification ................................................................................ 19

C. Powers and Duties of Plan Administrator ................................................ 19

1. Powers and Duties ........................................................................... 19

D. Establishment of Oversight Committee ................................................... 21

1. Appointment of Oversight Committee ............................................. 21

2. Reimbursement of Costs and Expenses ........................................... 21

3. Liability of Members of the Oversight Committee .......................... 22

4. Indemnification ................................................................................ 22

E. Establishment of Disputed Claims Reserve ............................................ 22

Disputed Claims Reserve ........................................................................ 22

F. Preservation of Causes of Action ........................................................... 23

G. General Disposition of Assets ................................................................. 23

H. Exemption from Certain Transfer Taxes ................................................. 23

I. Administrative Expense Claims Bar Date ................................................ 23

J. Deadline for Filing Applications For Payment of Professional Fee Claims ............... 24

K. Execution of Documents to Effectuate Plan ........................................... 24

L. Dissolution of the Debtor ........................................................................ 24

M. Post-Confirmation Reports and Fees ...................................................... 24

Reporting to Office of the United States Trustee .................................... 24

N. Official Committee ............................................................... 25Committee ............... 24

iii

O.  Insurance Preservation ...........................................................................................25

P.  Claims Administration Responsibility ....................................................................25

  1.  Reservation of Rights.........................................................................................25

  2.  Objections to Claims..........................................................................................25

  3.  Filing Objections................................................................................................25

  4.  Determination of ~~Claims ............................................................................... 26~~Claims
      ..........................................................................................................................25

Q.  Treatment of Claims without Further Order of the Court.........................................26

  1.  Certain Scheduled Claims..................................................................................26

  2.  Late Filed Claims..............................................................................................26

R.  Timing of Distributions on Disputed Claims Subsequently Allowed ........................26

S.  No Payment or Distribution of Disputed Claim ......................................................26

T.  Disputed Claims.....................................................................................................26

U.  Limitations on Funding of Disputed Claims Reserve...............................................27

V.  Tax Requirements for Income Generated by Disputed Claims Reserve ....................27

VI.  EXECUTORY CONTRACTS AND UNEXPIRED LEASES ...................................27

A.  General Provisions ................................................................................................27

B.  Notice of Deemed Rejection/Rejection Bar Date ...................................................28

C.  Compensation and Benefit Programs......................................................................28

VII.  INJUNCTIONS; EXCULPATIONS .......................................................................28

A.  General Injunctions................................................................................................28

  1.  Injunctions Against Interference with Consummation or Implementation of Plan
      ..........................................................................................................................28

  2.  Plan Injunction ..................................................................................................28

iv

3.  Release of Collateral ................................................................29

B.  Exculpation ................................................................................29

C.  All Distributions Received in Full and Final Satisfaction ............29

D.  No Modification ..........................................................................30

E.  No Discharge of Claims...............................................................30

VIII.  CONDITIONS PRECEDENT ...........................................................30

A.  Conditions Precedent to Confirmation of the Plan .....................30

B.  Conditions Precedent to the Effective Date ..............................31Date
...................................................................................................30

C.  Waiver of Conditions Precedent ..................................................31

IX.  PROCEDURES FOR DISTRIBUTIONS UNDER PLAN .........................31

A.  Distributions by Plan Administrator ............................................31

B.  Indefeasibility of Distributions ...................................................31

C.  Frequency of Distributions .........................................................31

D.  Payments in U.S. Dollars.............................................................31

E.  Claims in U.S. Dollars .................................................................31

F.  Distributions Only on Business Days ..........................................32

G.  Transmittal of Payments and Notices .........................................32

H.  Record Date for Distributions......................................................32

I.  Unclaimed Distributions ..............................................33Distributions
...................................................................................................32

J.  No Payments of Fractional Cents or Distributions of Less Than One Hundred Dollars
................................................................................33Dollars
...................................................................................................32

K.  Setoff and Recoupment...............................................................33

v

L.   Payment of Taxes on Distributions Received Pursuant to the Plan .............................33

M.   Compliance With Tax Withholding and Reporting Requirements ..............................34

N.   Disputed Distribution ..............................................................................................34

X.   RETENTION OF JURISDICTION BY BANKRUPTCY COURT .............................34

XI.   CERTAIN TAX CONSEQUENCES OF THE PLAN ..............................................35

A.   General ....................................................................................................................35

B.   Tax Consequences of Payment of Allowed Claims Pursuant to Plan Generally
................................................................................................36Generally
................................................................................................35

1.   Recognition of Gain or Loss ...................................................................................36

2.   Bad Debt or Worthless Security Deduction ............................................................36

3.   Receipt of Interest ...............................................................37Interest
................................................................................................36

XII.   CONFIRMATION OF PLAN – REQUIREMENTS ...............................................37

A.   Absolute Priority Rule ...........................................................................................37

B.   Best Interest of Creditors Test; Liquidation Analysis ...........................................38

XIII.   PLAN RELATED RISK FACTORS AND ALTERNATIVES TO CONFIRMATION
AND CONSUMMATION OF THE PLAN ............................................................39

A.   Certain Bankruptcy-Related Considerations...........................................................39

1.   Parties in Interest May Object to the Debtor's Classification of Claims ...............39

2.   Risk of Plan Not Being Confirmed .........................................................................39

3.   Nonconsensual Confirmation..........................................................40Confirmation
................................................................................................39

4.   Risks that Conditions to Effectiveness Will Not Be Satisfied ...............................40

5.   Actual Plan Distributions May Be Less Than Estimated for Purposes of the
Disclosure Statement ..............................................................................................40

6.  Claims Objections/Reconciliation Process ...........................................................40

B.  Alternatives to the Plan and Consequences of Rejection...........................................40

1.  Alternative Plans .............................................................41Plans
...........................................................................................................40

2.  Chapter 7 Liquidation ......................................................41Liquidation
...........................................................................................................40

XIV.  PROCEDURES FOR VOTING ON PLAN ............................................................41

XV.  CONFIRMATION HEARING .............................................................................42

XVI.  RECOMMENDATION .......................................................................................43

**PLEASE READ THIS DISCLOSURE STATEMENT CAREFULLY.  THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN WHICH IS ENCLOSED WITH THIS DISCLOSURE STATEMENT.   THE DEBTOR BELIEVES THAT THE PLAN IS IN THE BEST INTERESTS OF THE DEBTOR AND ITS CREDITORS AND PROVIDES THE HIGHEST AND MOST EXPEDITIOUS RECOVERIES TO HOLDERS OF ALLOWED CLAIMS AGAINST THE DEBTOR.**

382 Channel Drive LLC, f/k/a Publishers Clearing House LLC (the "Debtor" or "PCH")[1] submits this amended disclosure statement (the "Disclosure Statement") pursuant to section 1125 of the Bankruptcy Code to accompany the Amended Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code dated August 7October 22, 2025 (the "Plan"), which has been filed with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

## I.    PURPOSE AND LIMITATIONS OF DISCLOSURE STATEMENT

### A.    Purpose of Disclosure Statement

The purpose of the Disclosure Statement is to set forth information that (i) summarizes the Plan and alternatives to the Plan, (ii) advises Holders of Claims[2] and Equity Interests of their rights under the Plan, (iii) assists creditors entitled to vote in making informed decisions as to whether they should vote to accept or reject the Plan, and (iv) assists the Bankruptcy Court in determining whether the Plan complies with the provisions of chapter 11 of the Bankruptcy Code and should be confirmed.

You are urged to read the Disclosure Statement in order to determine what rights you may have to vote on or object to the Plan and before making any decision on any such course of action. Particular attention should be directed to the provisions of the Plan affecting or impairing your rights as they existed before the institution of this Chapter 11 Case.  Please note, however, that this Disclosure Statement cannot tell you everything about your rights.  For instance, this Disclosure Statement cannot and does not provide a complete description of the financial status of the Debtor, all of the applicable provisions of the Bankruptcy Code, or other matters that may be deemed significant by creditors and other parties in interest.  You are also encouraged to consult with your lawyers and/or advisors as you review and consider the Disclosure Statement and the Plan to enable you to obtain more specific advice on how the Plan will affect you.

### B.    Definitions and Exhibits

Definitions   Unless otherwise defined herein, capitalized terms used in this Disclosure Statement will have the meanings ascribed to such terms in the Plan.

1.    **Exhibits**   The following exhibits are annexed hereto and expressly incorporated herein:

---

[1] On August 26, 2025, the Court entered an order authorizing the change of the Debtor's corporate name from Publishers Clearing House LLC to 382 Channel Drive LLC [Docket No. 233].
[2] Capitalized terms not defined herein shall have the meaning ascribed to them in the Plan.

| Exhibit | Description |
|---------|-------------|
| A | Liquidation Analysis |

**C.  Enclosures**

The following materials are included with this Disclosure Statement[3]:

1.   A copy of the Plan;

2.   A copy of an order approving the Disclosure Statement (the "Disclosure Statement Approval Order"), which states: (a) the date by which objections to confirmation of the Plan must be served and filed, (b) the date by which all votes with respect to the Plan must be cast, (c) the date of the hearing in the Bankruptcy Court to consider confirmation of the Plan, and (d) other relevant information;

3.   Notice of Confirmation Hearing.  A copy of the notice of the deadline for submitting ballots to accept or reject the Plan and, among other things, the date, time and place of the Confirmation Hearing and the deadline for filing objections to confirmation of the Plan (the "Confirmation Hearing Notice");

4.   A ballot for voting to accept or reject the Plan;

5.   A W-9 form to complete and return; and

6.   A letter from counsel to the Official Committee encouraging acceptance of the Plan.

**D.  Representations and Limitations**

**NO PERSON IS AUTHORIZED IN CONNECTION WITH THE PLAN OR THE SOLICITATION OF VOTES THEREON TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS ANNEXED HERETO OR INCORPORATED HEREIN BY REFERENCE OR REFERRED TO HEREIN, AND IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE DEBTOR.**

**NO REPRESENTATIONS CONCERNING THE DEBTOR OR THE PLAN ARE AUTHORIZED OTHER THAN AS SET FORTH HEREIN. ANY REPRESENTATIONS OR INDUCEMENTS TO SECURE YOUR ACCEPTANCE OF THE PLAN OTHER THAN AS CONTAINED HEREIN SHOULD NOT BE RELIED UPON BY YOU.**

**THE INFORMATION CONTAINED HEREIN HAS BEEN PREPARED BY THE DEBTOR IN GOOD FAITH, BASED UPON UNAUDITED INFORMATION AVAILABLE**

---

[3] You may not receive paper copies of all of these materials.  All documents are available to view through the Debtor's restructuring website (https://omniagentsolutions.com/PCH-Ballots).

TO IT AS OF THE DATE HEREOF.  ALTHOUGH THE DEBTOR HAS USED BEST EFFORTS TO ENSURE THAT SUCH INFORMATION IS ACCURATE, THE INFORMATION CONTAINED HEREIN IS UNAUDITED.  THE DEBTOR BELIEVES THAT THIS DISCLOSURE STATEMENT COMPLIES WITH THE REQUIREMENTS OF THE BANKRUPTCY CODE.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF, UNLESS ANOTHER TIME IS SPECIFIED HEREIN, AND DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT CREATE ANY IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE FACTS SET FORTH HEREIN SINCE THE DATE OF THIS DISCLOSURE STATEMENT AND/OR THE DATE THAT THE MATERIALS RELIED UPON IN PREPARATION OF THIS DISCLOSURE STATEMENT WERE COMPILED.

THE DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN, AND NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE ADVICE ON THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON HOLDERS OF CLAIMS AGAINST THE DEBTOR.

THE DESCRIPTION OF THE PLAN CONTAINED IN THIS DISCLOSURE STATEMENT IS INTENDED AS A SUMMARY ONLY AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN ITSELF.  EACH CREDITOR IS ENCOURAGED TO READ, CONSIDER, AND CAREFULLY ANALYZE THE TERMS AND PROVISIONS OF THE PLAN.

E.  **Important Dates**

The Bankruptcy Court approved this Disclosure Statement by and through the Disclosure Statement Approval Order entered on ____, 2025 after notice and a hearing and in accordance with section 1125 of the Bankruptcy Code.  The Bankruptcy Court found that the information contained herein is of the kind, and is sufficiently detailed, to enable a hypothetical, reasonable investor typical of the class being solicited to make an informed judgment concerning the Plan.  **HOWEVER, THE BANKRUPTCY COURT HAS NOT CONFIRMED THE PLAN, NOR IS THIS DISCLOSURE STATEMENT OR THE DISCLOSURE STATEMENT APPROVAL ORDER TO BE CONSTRUED AS APPROVAL OR ENDORSEMENT OF THE PLAN BY THE BANKRUPTCY COURT.**

As stated in the Disclosure Statement Approval Order, the Bankruptcy Court has scheduled a hearing to consider Confirmation of the Plan for _____ **(EST)**.  Holders of Claims and other parties in interest may attend this hearing.  Objections to confirmation of the Plan must be filed on or before _____ as set forth in the Disclosure Statement Approval Order.

All Ballots with respect to the Plan must be completed in full and signed to be counted in the tabulation of the votes and must be received by the Voting Agent no later than **5:00 p.m. (EST) on** _____ .

Completed and signed Ballots should be returned by first class mail to the Voting Agent at the below address:

*By First Class Mail or Overnight/Hand Delivery:*

Publishers Clearing House LLC Ballot Processing
c/o Omni Agent Solutions, Inc.
5955 De Soto Ave., Suite 100
Woodland Hills, CA 91367

Additionally, Ballots can be submitted electronically to the following website:

https://omniagentsolutions.com/PCH-Ballots

**F.   Solicitation Procedures**

Creditors holding Claims that are impaired have the right to vote to accept or reject the Plan. Generally speaking, a Claim is impaired if the Plan alters the legal, contractual or equitable rights of the Holder of the Claim.  A Class of creditors accepts the Plan when creditors holding two-thirds in amount of such class and more than one-half in number of the Claims in such class who actually cast their ballots vote to accept the Plan.

In this Chapter 11 Case, the Plan contains four (4) Classes of Claims and Equity Interests. The Plan provides that Holders of Claims or Equity Interests in two (2) Classes are impaired in that the Plan alters the legal, contractual and equitable rights of the Holders of such Claims.

**G.   Recommendation**

In the opinion of the Debtor, the treatment of creditors under the Plan contemplates a greater recovery than that which is likely to be achieved under any other alternative for the liquidation of the Debtor's assets under chapter 11 or chapter 7 of the Bankruptcy Code.  Accordingly, the Debtor believes that confirmation of the Plan is in the best interests of the Debtor's creditors and recommends that all Holders of Claims entitled to vote on the Plan vote to accept the Plan.

**H.   Inquiries**

If you have any questions about the packet of materials that you have received, please contact the Voting Agent by telephone at (888) 710-5634 (U.S. and Canada toll free) and (818) 381-4518 (International) during normal business hours.

II.    **BACKGROUND**

A.    **Corporate and Ownership Structure**

PCH was formed as a partnership in 1953 by Harold and LuEsther T. Mertz and their daughter Joyce in the basement of their Long Island home.  The company was reformed as a New York limited partnership in 1957 and then converted into a New York limited liability company in 2002.  PCH did business under the trade names Liquid Wireless, Liquid, Funtank, and PCH Media.

PCH was essentially a family-owned company.  The shareholders consisted of a number of individuals, both as successors to the original founders and as remaindermen and beneficiaries of trusts created by them for the benefit of nieces and nephews of Harold and LuEsther Mertz, and various charitable interests.  Almost 55% of the equity interests in PCH were held by charities and charitable trusts created by the founders, other family members or their successors that support the arts, the environment, medical research and facilities, first responders and other worthy causes. There were no shareholders who were individuals other than members of the Mertz family or their descendants and successors. Shareholders played no role in management.  No family member was employed by PCH, and no family member had executive power or authority.

B.    **The Debtor's Business**

1.    **Overview**

PCH was known across America as the sweepstakes company whose famous Prize Patrol surprised winners on their doorsteps, presenting oversized checks ranging from $10,000 to Multi-Millions while TV cameras were rolling.  The company awarded over half a billion dollars in prizes and evolved to offer many ways to win online and through social media and mobile access.

2.    **Original Founding**

PCH's business began when Harold Mertz, who had worked in the magazine business, created the opportunity for many magazine publishers to solicit subscribers to their titles through a single direct mail offer.  Mertz called it a "car pool for publishers," and it was almost immediately successful.  The company's first mailings were of 10,000 envelopes sent from the Mertz' home on Long Island, New York, and offered 20 magazine subscriptions.  The concept was simple.  Should a consumer choose to order a title from the PCH mailing, magazine publishers would receive a portion of order revenue, and PCH would retain the rest as a commission on the sale.  In addition, the magazine publishers would then have the ability to more economically contact consumers directly for renewal subscriptions.  Having started in the basement of his home, Mr. Mertz often joked that there was no other way to go than up!  And up the company did quickly rise.  The concept took off, and the business profited by the efficiencies that it offered to the publishers.

3.    **Sweepstakes Introduction**

In 1967, PCH introduced its first direct mail sweepstakes, allowing customers to enter for a chance to win a monetary prize regardless of whether or not they purchased a magazine

5

subscription. The concept of a nationwide direct mail sweepstakes had first been popularized several years earlier by *Reader's Digest*. The PCH sweepstakes offers were an immediate and overwhelming success, quickly joining magazine offers as the hallmark of the company. Mailings combined discounted magazine subscription offers with the opportunity to enter sweepstakes—always emphasizing that no purchase was ever necessary to enter. The offer resonated with millions of consumers, making PCH a household name. From the 1960s through the 1990s, PCH was often recognized as one of the largest mailers in the country, second only to the IRS during tax season.

### 4. Prize Patrol Creation

Initially, PCH winners were selected and notified by phone or mail to let them know they had won. However, witnessing the joy and excitement of winners inspired the company to experiment with live, in-person prize announcements without prior notice. The success of this approach led to the creation of the PCH "Prize Patrol" in 1989. The Prize Patrol, a team of PCH employees, began surprising winners at their doorsteps with balloons, champagne, flowers, and the now-famous Big Check. These surprise visits were filmed and featured in PCH's television commercials, showcasing the genuine excitement of unsuspecting winners. The Prize Patrol quickly became a cultural phenomenon, humorously referenced in popular shows such as *Seinfeld*, *Saturday Night Live*, *Cheers*, and numerous cartoons, TV shows, and movies. In a memorable moment, President George W. Bush joked publicly, after acknowledging that Al Gore had won the Nobel Peace Prize, that he might win something, maybe the Publishers Clearing House sweepstakes, in his own retirement. The iconic Big Check became a universal symbol of prizes, giveaways, and charitable contributions, with its creative imagery widely imitated by others to represent awards and significant donations.

### 5. Moving Beyond Magazines/Diversification

PCH experienced significant growth and success throughout the 1960s, 1970s, and 1980s, fueled by direct mail magazine offerings and ubiquitous television commercials. In the early 1990s, the company diversified its offerings beyond magazine subscriptions, introducing a wide range of products such as books, collectibles, coins, sports memorabilia, and home goods. The expansion to products proved to be a major success, as consumers enthusiastically embraced the variety of merchandise available through PCH's direct mail campaigns. The profitability of these new offerings sustained growth and helped shield the company from the challenges faced by the magazine industry, which was gradually transitioning to digital platforms as publishers adapted to the online era, as print publications withered.

### 6. Digital Transition

While traditional mail-order marketing continued, PCH looked to the future and, in the late 90's, added digital marketing under the pch.com banner. The company expanded its digital presence through the acquisition of several digital sites and the offering of online games, quizzes, and sweepstakes to attract a new generation of customers.

PCH   acquired the assets of search company Blingo in 2006, online gaming company Funtank in 2010, mobile marketing company Liquid Wireless in 2012, entertainment focused quiz content creator Topix in 2019, and digital publishers Wide Open Media in 2020.   Blingo Inc. brought to PCH an ad-supported metasearch engine that was later re-branded as PCH Search & Win, providing significant income to PCH at the time with little overhead.  Changes in the online search business have since reduced the revenue-earning opportunity represented by the Search & Win program, which was no longer a meaningful contributor to the Debtor's overall revenue. However, the creation of the online e-commerce marketing programs became a primary source of online revenue, along with third party advertising, search and other related online programs.  As 2018 approached, company revenue came close to crossing the $1 billion mark.

However, while PCH's direct mail and e-commerce programs were profitable for decades, changing patterns of consumer behavior, costs and competition, along with a declining pool of new prospecting names, negatively impacted the business, resulting in losses beginning in 2022. Consumer expectations were rapidly shifting toward speedy fulfillment and cost-free shipping, both unsustainable for PCH with its low-priced, impulsive-purchase product offerings.  Increased paper and shipping costs, combined with the dominance of major commerce platforms like Amazon and Walmart online stores, offering fast, free delivery of an astonishingly wide range of products, resulted in decreasing consumer demand, revenue and margins within the commerce business, resulting in rapidly increasing operational losses.

As a result, PCH made the incredibly difficult decision to begin winding down its commerce division, finalizing this closure at the end of 2024.  Throughout this time, PCH remained committed to providing its consumers with highly engaging entertainment experience powered by sweepstakes and contests opportunities via its digital marketing platforms.

### 7.  The Debtor's Operations and Revenue

As of the Petition Date, PCH offered a robust variety of free-to-play, chance-to-win digital games and entertainment across a network of web and app-based entertainment properties.  PCH's continued success in the digital publishing environment was built on its unique, free-to-play, chance-to-win propositions.  Data and analytics had always been at the core of the PCH business strategy, optimizing engagement through relevant, personalized offers, based on the trusted first-party relationship PCH had with its audience.

Through the PCH/Media division, consumer brands and advertising agencies were able to build direct-to-consumer relationships. PCH's web properties and apps were ad-supported and attracted millions of visitors every year – approximately 36 million in 2024.  PCH had a highly engaged user base which allowed the company to serve relevant, interest-based, targeted advertising to specific audience segments.  Success in digital publishing relies on traffic, quality content and consumer engagement.  With PCH's sustained consumer engagement, and continued development of quality content in the casual gaming, survey and quiz spaces, PCH was able to maximize ad revenue by offering attractive placements to advertisers.

Advertisers paid PCH through a variety of engagement metrics, such as ad views, clicks and/or user actions. By leveraging PCH's rich first-party data, the company offered highly targeted

ad placements, which was a huge competitive benefit.   PCH's use of audience segments provided the ability to accurately reach relevant audiences.  Advertisers came to PCH to target a specific demographic or affinity group resulting in the advertising being more valuable since it was reaching consumers who were more likely to be interested in the offering.

In the years prior to the Petition Date, PCH made significant efforts to transform and grow revenue in the digital  business platform via the creation and leveraging of permissioned first party data profiles (available to advertisers both on and off platform) and PCH's unique ability to obtain high quality consumer insights on a permissioned, user ~~0friendly~~friendly basis from identified individuals.

### III.   SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASE

#### A.   Retention of Professionals

On May 15, 2025, the Bankruptcy Court entered the following orders:  (i) an order granting the application to employ Klestadt Winters Jureller Southard & Stevens ("KWJS&S") as general bankruptcy counsel to the Debtor effective as of the Petition Date [Docket No. 89], (ii) an order granting the application to employ Omni Agent Solutions, Inc. ("Omni") as claims and noticing agent to the Debtor effective as of the Petition Date [Docket No. 90], (iii) an order approving procedures for the retention and compensation of attorneys utilized by the Debtor in the ordinary course of business (the "Ordinary Course Professional Order") [Docket No. 91], (iv) an order granting the application to employ Omni as administrative agent to the Debtor effective as of the Petition Date [Docket No. 94], (v) an order (a) authorizing the employment and retention of Getzler Henrich & Associates, LLC to provide restructuring management services and (b) approving the designation of William H. Henrich and Laurence Sax as Co-Chief Restructuring Officers to the Debtor, effective as of the Petition Date [Docket No. 95], and (vi) an order granting the application to employ SSG Advisors, LLC ("SSG") as investment banker to the Debtor effective as of the Petition Date [Docket No. 96].

In accordance with the Ordinary Course Professional Order, the Debtor retained the following attorneys:  (i) Peter M. Levine to provide litigation services [Docket No. 112], (ii) Groom Law Group, Chartered to provide tax, ERISA and other federal law services related to the Debtor's compensation and benefit plans [Docket No. 114], (iii) Jackson Lewis P.C. to provide legal advice and counsel related to employment matters [Docket No. 125], (iv) Greenberg Traurig, LLC to provide legal advice and counsel related to real estate matters [Docket No. 134], (v) Mahamedi IP Law LLP to provide patent maintenance and prosecution services [Docket No. 182], ~~and~~ (vi) Morgan, Lewis & Bockius LLP to provide legal advice and counsel related to corporate and intellectual property matters [Docket No. ~~183]~~183], and (vii) Baker & Hostetler LLP to represent the Debtor in a class action data breach litigation [Docket No. 256].

Also on May 15, 2025, the Court "So Ordered" a joint stipulation directing the U.S. Trustee to appoint a consumer privacy ombudsman [Docket No. 100] and on May 16, 2025, the U.S. Trustee filed a notice appointing Lucy L. Thomson as Consumer Privacy Ombudsman [Docket No. 102].

8

On April 24, 2025, the U.S. Trustee appointed an Official Committee consisting of the following three members:  (1) Marc D. Friedman, (2) AG-We're 300 Jericho, LLC, and (3) Senior Midwest Direct Inc. dba Jetson Mailers [Docket No. 44].  On June 9, 2025, the Bankruptcy Court entered an order granting the application to employ Rimôn P.C. ("Rimôn") as counsel to the Official Committee [Docket No. 138].

**B.  Schedules of Assets and Liabilities, Statement of Financial Affairs**

On May 16, 2025, the Debtor filed schedules of assets and liabilities [Docket No. 103] and a statement of financial affairs [Docket No. 104].  On June 13, 2025, the Debtor filed Amended Schedule E/F and Amended Schedule G [Docket No. 147].

**C.  Creditor Claims and the Bar Date for Filing of Claims Arising Prior to the Petition Date**

The Schedules and Amended Schedules filed by Debtor listed the following amounts outstanding: (i) three (3) disputed secured claims totaling $0, (ii) approximately one hundred (100) priority wage unsecured claims totaling approximately $790,000, and (iii) approximately 298,000 general unsecured claims totaling approximately $67 million, of which six (6) are listed as contingent, unliquidated, and/or disputed.  Each claim scheduled by the Debtor is referred to as a "Scheduled Claim," and collectively, "Scheduled Claims".

On May 21, 2025, the Bankruptcy Court entered an order (the "Bar Date Order") [Docket No. 115] fixing a deadline (the "Bar Date") and establishing procedures for filing proofs of claim against the Debtor and its bankruptcy estate pursuant to Bankruptcy Rule 3003(c)(3).  The Bar Date Order fixed July 14, 2025 as the bar date by which all Claims which arose prior to April 9, 2025, other than for governmental units, with respect to the Debtor had to be filed.  The Bar Date Order also set a bar date of October 6, 2025 with respect to governmental entities.

In accordance with Bankruptcy Rule 3003(c)(2), holders of claims who failed to comply with the terms of the Bar Date Order, are forever barred from (i) filing a proof of claim with respect to such Claim, (ii) asserting such Claims against the Debtor or its Estate and/or property, (iii) voting on any plan filed in this Chapter 11 Case, and (iv) participating in any Distribution in the Chapter 11 Case on account of such Claims.

As of the date of this Disclosure Statement, a total of approximately 200250 claims were filed against the Debtor and its bankruptcy estate.  The claims asserted the following amounts: (i) five (5) administrative claims in the amount of approximately $5 million and other unliquidated amounts; (ii) three (3) secured claims in the amount of approximately $20,000 and other unliquidated amounts; (iii) approximately 6065 priority claims in the amount of approximately $1.25 million; and (iv) approximately 165180 general unsecured claims in the amount of approximately $2.53.7 billion.  The Debtor has been working to reconcile the Scheduled Claims and proofs of Claim filed to determine which, if any, warrant objection.

Formatted: Font: +Body (Calibri)

### D. __Debtor-in-Possession Financing__

On the Petition Date, the Debtor filed a motion (the "__DIP Motion__") [Docket No. 8] seeking approval of a post-petition senior secured receivables purchase financing facility in an amount of up to $5,500,000 from Prestige Capital Finance, LLC (the "__DIP Facility__") secured by all assets of the Debtor.

The DIP Motion was approved by the Court on an interim basis by Order dated April 14, 2025 [Docket No. 23] and on a final basis by Order dated May 2, 2025 [Docket No. 61] (the "__DIP Order__").

### E. __Sale of Substantially All of the Debtor's Assets and Repayment of DIP Facility__

On May 1, 2025, the Debtor filed a motion (the "__Sale Motion__") which sought, among other things, entry of an order pursuant to sections 105(a), 332, 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006 approving bidding procedures (the "__Bidding Procedures__") in connection with the sale (the "__Sale__") and potential auction (the "__Auction__") of the Debtor's assets free and clear of all liens, claims, encumbrances, and interests and directing the appointment of a consumer privacy ombudsman [Docket No. 59].

On May 29, 2025, the Court entered an order approving the procedures for the Sale of the Debtor's assets (the "__Bidding Procedures Order__") [Docket No. 127].

In accordance with the Bidding Procedures Order, on June 17, 2025, the Debtor and SSG conducted an auction (the "__Auction__") of the Debtor's assets, and at the conclusion of the Auction, the Debtor declared ARB Interactive, Inc. or its designee (the "__Purchaser__") as the successful bidder and PCH Interactive, LLC as the next-highest bidder [Docket No. 154].

On June 24, 2025, the Consumer Privacy Ombudsman filed a report with the Court, wherein she advised the Court on the issues related to privacy and the protection of personally identifiable information of the Debtor's consumers [Docket No. 166].

On June 30, 2025, the Court issued a memorandum opinion granting the Sale Motion [Docket No. 176] and entered an order authorizing the Sale of substantially all of the Debtor's assets, excluding the Debtor's accounts receivable, to the Purchaser free and clear of all liens, claims, encumbrances and other interests (the "__Sale Order__") [Docket No. 177].

In accordance with Section 11.5 of that certain Asset Purchase Agreement (the "__Purchase Agreement__"), dated as of June 18, 2025, by and between the Debtor and the Purchaser, and that certain Notice of Assignment dated July 9, 2025, the Purchaser assigned all of its rights and obligations under the Purchase Agreement to PCH Digital LLC ("__NewCo__").

10

In accordance with Section 11.2 of the Purchase Agreement and paragraph 27 of the Sale Order, the Debtor and NewCo entered into that certain Amendment No. 1 to the Purchase Agreement, dated as of July 14, 2025 (the "Amendment").  A copy of the Purchase Agreement and Amendment, together with all schedules and exhibits thereto was filed at Docket No. 193.

In accordance with the Purchase Agreement and Amendment, the purchase price paid by NewCo was $7,1000,000, plus over $670,000 in cure costs related to contracts that were assumed and assigned to NewCo under section 365 of the Bankruptcy Code.  The Debtor filed three (3) separate notices establishing cure claim bar dates for the non-debtor counterparties to the contracts that were assumed and assigned to NewCo [Docket Nos. 146, 184, and 191]. In addition, the Debtor retained its outstanding accounts receivable, and NewCo assumed the following prize winner liabilities: (i) prices in respect of any contests launched by the Debtor following the Petition Date, (ii) two outstanding super-prizes, not to exceed $2,500,000 in the aggregate, and (iii) one super-prize awarded on May 31, 2025, not to exceed $975,000 in the aggregate.  NewCo did not assume annuity prize winner obligations as part of the Sale transaction.

As set forth in a Notice filed with the Court, the Sale to NewCo closed on July 15, 2025 [Docket No. 193].  On such date, in accordance with the Sale Order and DIP Order, the Debtor utilized a portion of the proceeds of the Sale to satisfy in full its obligations under the DIP Facility, such that the DIP Facility was terminated, and the first priority liens and security interests granted thereunder were released.

**F.  Rejection of Executory Contracts and Unexpired Leases**

Immediately prior to the closing of the Sale, on July 14, 2025, the Debtor provided notice to its employees and consultants of (i) the rejection of their respective employment agreements, offer letters, or consulting agreements, as applicable, and (ii) their respective termination from the Debtor effective as of July 14, 2025 at 11:59 p.m. (EST).  On July 14, 2025, the Debtor filed motions seeking entry of orders authorizing the rejection of all employment related agreements effective as of July 14, 2025 [Docket Nos. 187 and 188].

In connection with the liquidation of its business, the Debtor no longer had a need for certain of the premises that it operated out of.  As a result, the Debtor obtained Court approval to reject certain unexpired leases for non-residential real property located in Jericho, New York and Portland, Maine as of the Petition Date [Docket No. 93].  ~~In addition, on July 21~~In addition, on August 14, 2025 the Debtor obtained Court approval to reject a certain unexpired sublease for non-residential real property located in New York City as of July 14, 2025 [Docket No. 224].  On September 30, 2025, the Debtor filed a motion seeking to reject that certain unexpired lease for non-residential real property located in ~~New York City as of July 14, 2025 [Docket No. 200].  The Debtor intends to reject that certain unexpired lease for non-residential real property located in~~ Bethpage, New York ~~after it has liquidated all remaining assets, including artwork and other *de minimis* assets, at the Bethpage storage facility or removed all remaining assets from the storage facility.~~as of September 30, 2025 [Docket No. 254].

In addition to unexpired leases of non-residential real property, the Debtor identified contracts that are no longer necessary for the Debtor's operational needs or are otherwise

financially burdensome. Shortly after the Petition Date, the Debtor obtained Court approval to reject certain executory contracts [Docket Nos. 130 and 195]. In addition, following the closing of the Sale, in addition to seeking rejection of employment related agreements, as set forth above, the Debtor ~~filed an omnibus motion seeking~~obtained Court approval to reject certain other executory contracts [Docket No. ~~208~~236].

## IV.    SUMMARY OF THE PLAN OF LIQUIDATION

### A.    General Plan Objectives

Chapter 11 is the chapter of the Bankruptcy Code primarily used for business reorganization. Asset sales, stock sales, and other liquidation efforts, however, can also be conducted during a chapter 11 case or pursuant to a chapter 11 plan. Under chapter 11, the individual or company endeavors to restructure its finances such that it maximizes recovery to its creditors.

Formulation of a chapter 11 plan is the primary purpose of a chapter 11 case. A chapter 11 plan sets forth and governs the treatment and rights to be afforded to creditors with respect to their claims against the debtor. According to section 1125 of the Bankruptcy Code, acceptances of a chapter 11 plan may be solicited by the proponent of a plan only after a written disclosure statement has been provided to each creditor or equity holder who is entitled to vote on the plan.

The Plan is a plan of liquidation. In general, a chapter 11 plan of liquidation (i) divides claims into separate classes, (ii) specifies the property that each class is to receive under the plan, and (iii) contains other provisions necessary to implement the plan. Under the Bankruptcy Code, "claims" are classified rather than "creditors" because such entities may hold claims in more than one class.

### B.    Provisions Governing Order and Method for Distributions Under the Plan

The Plan divides Claims against the Debtor and Equity Interests into four (4) Classes according to the underlying basis and subsequent treatment for each. Claims within the same Class are treated identically and each Class in the Plan is treated differently.

Administrative Expense Claims, Priority Tax Claims, Professional Fee Claims and Ordinary Course Professional Claims are not classified but are treated in the manner set forth in Article 3 of the Plan and summarized below.

### C.    Classes of Claims

The following classes of Claims are designated pursuant to and in accordance with section 1123(a)(1) of the Bankruptcy Code, which Classes shall be mutually exclusive:

12

| Class | Claim | Treatment | Status | Voting Rights | Estimated Distribution |
|-------|-------|-----------|--------|---------------|------------------------|
| Class 1 | Secured Claims | Plan § 4.1 | Unimpaired | Deemed to Accept | See treatment of Class 1 |
| Class 2 | Priority Non-Tax Claims | Plan § 4.2 | Unimpaired | Deemed to Accept | See treatment of Class 2 |
| Class 3 | General Unsecured Claims | Plan § 4.3 | Impaired | Entitled to Vote | To Be Determined |
| Class 4 | Equity Interests | Plan § 4.4 | Impaired | Presumed to Reject | 0% |

### 1. Administrative Expense Claims

Administrative Expense Claims are not classified consistent with section 1123(a)(1) of the Bankruptcy Code. All Allowed Administrative Expense Claims, other than Professional Fee Claims and Ordinary Course Professional Claims, shall be paid by the Plan Administrator from the Post-Confirmation Estate Fund, in Cash, in such amounts as are incurred in the ordinary course of the liquidation of the Debtor, or in such amounts as may be Allowed by the Bankruptcy Court (a) as soon as practicable following the later of the Effective Date or the date upon which the Court enters a Final Order allowing any such Administrative Expense Claim, or (b) upon such other terms as may exist in accordance with the ordinary course of the Debtor's liquidation, or (c) as may be agreed upon between the Holder of any such Administrative Expense Claim and the Plan Administrator. In the event there exist any Disputed Administrative Expense Claims on the Effective Date, the Plan Administrator shall at all times hold and maintain Cash in an amount equal to that portion of a Disputed Claims Reserve attributable to all Disputed Administrative Expense Claims. Administrative Expense Claims are not Impaired by the Plan.

As of the filing of this Disclosure Statement, five (5) parties have filed administrative claims in the aggregate amount of approximately $5 million and other unliquidated amounts. Three (3) of the claims were unliquidated claims that were filed in the event administrative claim liability arises in the future. With respect to the two (2) parties that filed 503(b)(9) claims, totaling approximately $5 million, the Debtor or the Plan Administrator will be objecting to such claims and seeking to reclassify such claims as general unsecured claim, among other things. It is important to note that no bar date for Administrative Expense Claims has yet been established in this Chapter 11 Case. Moreover, though the Debtor believes that it has timely paid the necessary and beneficial costs of administering this Chapter 11 Case, it is possible that additional Administrative Expense Claims may be asserted in the future. Pursuant to Section 5.9 of the Plan, the bar date for Administrative Expense Claims will be thirty (30) days after mailing of notice that the Effective Date has occurred.

### 2. Priority Tax Claims

Priority Tax Claims are not classified consistent with section 1123(a)(1) of the Bankruptcy Code. On the Effective Date, or as soon thereafter as is reasonably practical, in full and final

satisfaction of such Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall receive (a) an amount in Cash equal to the Allowed amount of such Priority Tax Claim to be paid from the Post-Confirmation Estate Fund, or (b) such other treatment as to which the Plan Administrator and the Holder of such Allowed Priority Tax Claim shall have agreed upon in writing. In the event any Disputed Priority Tax Claims exist on the Effective Date, the Plan Administrator shall hold and maintain Cash in an amount equal to that portion of a Disputed Claims Reserve attributable to all Disputed Priority Tax Claims until such dispute is resolved consensually or by order of the Bankruptcy Court. Priority Tax Claims are not Impaired by the Plan.

For the avoidance of doubt, the treatment of Priority Tax Claims that are secured by tax liens or warrants shall be treated consistent with section 1129(a)(9)(D) of the Bankruptcy Code.

As of the date of this Disclosure Statement, approximately five (5) parties have filed Priority Tax Claims against the Debtor in the aggregate amount of approximately $20,000. The Debtor estimates that after reconciliation of such claims is complete and either negotiations or objections are concluded, remaining Priority Tax Claims against the Debtor will total approximately $1,500.

### 3. Professional Fee Claims

The Plan Administrator shall pay all Professional Fee Claims from the Post-Confirmation Estate Fund in the amount Allowed by the Bankruptcy Court as soon as practicable after entry of a Final Order awarding such compensation and reimbursement of expenses pursuant to proper application in accordance with Section 5.10 of the Plan. In the event any Disputed Professional Fee Claims exist on the Effective Date, the Plan Administrator shall hold and maintain Cash in an amount equal to that portion of a Disputed Claims Reserve attributable to all Disputed Professional Fee Claims until such dispute is resolved consensually or by order of the Bankruptcy Court. Professional Fee Claims are not Impaired by the Plan.

The outstanding and unpaid Professional Fee Claims as of JuneSeptember 30, 2025 are set forth in the below chart. Additional Professional Fee Claims will accrue until the Effective Date of the Plan.

| Firm | Accrued Fees | Accrued Expenses | Total Accrued Fees and Expenses | Unpaid Accrued Fees and Expenses |
|---|---|---|---|---|
| Klestadt Winters Jureller Southard & Stevens, LLP<br><br>*General Counsel to the Debtor* | $565,907.54958,003.04 | $2,480.694,607.24 | $568,388.23962,610.28 | $441,070.00240,648.18 |

14

| Firm | Accrued Fees | Accrued Expenses | Total Accrued Fees and Expenses | Unpaid Accrued Fees and Expenses |
|---|---|---|---|---|
| Getzler Henrich & Associates, LLC<br><br>*Financial Advisor to the Debtor* | $~~290,521~~382,286.50 | $0.00 | $~~290,521~~382,286.50 | $~~0.00~~12,050.50 |
| SSG Advisors, LLC<br><br>*Investment Banker to the Debtor* | $~~650~~700,000.00 | $~~0~~2,250.00 | $~~650,000~~702,250.00 | $~~610,000~~662,250.00 |
| Rimôn P.C.<br><br>*Counsel to the Official Committee* | $~~139,640.00~~255,017.50 | $~~0.00~~23.30 | $~~139,640.00~~255,040.80 | $~~85,669.20~~70,684.30 |
| Lucy L. Thompson<br><br>*Consumer Privacy Ombudsman* | ~~Approximately $36,000~~$35,700.00 | $~~0~~225.00 | ~~Approximately $36,000~~$35,925.00 | ~~Approximately $36,000~~$35,925.00 |
| **TOTAL:** | $~~1,682,069~~2,331,007.04 | $~~2,480.69~~7,105.54 | $~~1,684,549.73~~2,338,112.58 | $~~1,172,739.20~~1,021,557.98 |

**4. Ordinary Course Professional Claims**

All requests for payment of Ordinary Course Professional Claims incurred prior to the Effective Date shall be made pursuant to the Ordinary Course Professional Order.  The amount of Ordinary Course Professional Claims owing to the Ordinary Course Professionals shall be paid in Cash to such Ordinary Course Professionals by the Debtor or the Plan Administrator, as applicable,

from Cash on hand as soon as reasonably practicable after such Ordinary Course Professional Claims are Allowed pursuant to the Ordinary Course Professional Order.  The Plan Administrator shall have no obligation to pay any fees and expenses incurred by any of the Ordinary Course Professionals on or after the Effective Date unless and until such Ordinary Course Professional and the Plan Administrator have entered into a new engagement agreement.  Ordinary Course Professional Claims are not Impaired by the Plan.

The outstanding and unpaid Ordinary Course Professional Claims as of ~~June~~September 30, 2025 are set forth in the below chart.  Additional Ordinary Course Professional Claims will accrue until the Effective Date of the Plan.

| Ordinary Course Professional Firm | Accrued Fees | Accrued Expenses | Total Accrued Fees and Expenses | Unpaid Accrued Fees and Expenses |
|---|---|---|---|---|
| Peter M. Levine | $~~1,595.00~~2,328.33 | $0.00 | $~~1,595.00~~2,328.33 | $0.00 |
| Groom Law Group, Chartered | $~~11,655.25~~28,733.20 | $0.00 | $~~11,655.25~~28,733.20 | $~~11,655.25~~12,650.45 |
| Jackson Lewis P.C. | $~~8,335.66~~6,933.92 | $~~14,244.45~~11,414.63 | $~~22,580.11~~18,348.55 | $~~22,580.11~~0.00 |
| Greenberg Traurig, LLC | $5,965.50 | $0.00 | $5,965.50 | $~~5,965~~3,487.50 |
| Mahamedi IP Law LLP | ~~-~~$5,498.00 | ~~-~~$0.00 | ~~-~~$5,498.00 | ~~-~~$0.00 |
| Morgan, Lewis & Bockius LLP | $~~44,415.88~~42,915.46 | $~~0.00~~771.67 | $~~44,415.88~~43,687.13 | $~~44,415.88~~0.00 |
| Baker & Hostetler LLP | $7,157.50 | $0.00 | $7,157.50 | $3,661.50 |
| **TOTAL:** | $~~71,967.29~~99,531.91 | $~~14,244.45~~12,186.30 | $~~86,211.74~~111,718.21 | $~~84,616.74~~19,799.45 |

5.  **Class 1 (Secured Claims)**

On the Effective Date, or as soon thereafter as is reasonably practical, each Holder of an Allowed Secured Claim shall receive either (i) delivery of collateral securing such Allowed Secured Claim, (ii) the net proceeds, if any, of the sale or other disposition of the Assets on which such Holder has a Lien; or (iii) such other, less favorable treatment as may be agreed to in writing by the Holder of such Allowed Secured Claim and the Plan Administrator. Any Deficiency Claim which may arise on account of the lack of Collateral or otherwise resulting from the aforesaid treatment shall be treated as a Class 3 General Unsecured Claim.

Class 1 is Unimpaired and Holders of Class 1 Secured Claims are presumed to accept the foregoing treatment and therefore are not entitled to vote on the Plan.

As of the date of this Disclosure Statement, ~~two (2~~seven (7) parties have filed Class 1 Claims against the Debtor in the aggregate amount of approximately $~~20~~200,000. The Debtor estimates that after reconciliation of such claims is complete and either negotiations or objections are concluded, remaining Class 1 Secured Claims against the Debtor will total $0 after the delivery of collateral securing such Allowed Secured Claim takes place.

### 6. Class 2 (Priority Non-Tax Claims)

On the Effective Date, or as soon thereafter as is reasonably practical, each Holder of an Allowed Priority Non-Tax Claim shall receive (a) an amount in Cash equal to the Allowed amount of such Priority Non-Tax Claim, or (b) such other treatment as to which the Debtor and the Holder of such Allowed Priority Non-Tax Claim shall have agreed upon in writing.

Distributions to Holders of Allowed Class 2 Claims shall be made by the Plan Administrator from the Post-Confirmation Estate Fund until all Allowed Class 2 Claims are paid in full.

Class 2 is Unimpaired and Holders of Priority Non-Tax Claims are presumed to accept the foregoing treatment and therefore are not entitled to vote on the Plan.

As of the date of the Disclosure Statement, approximately 110 parties have filed or otherwise hold scheduled Class 2 Claims in the aggregate amount of approximately $1.~~2~~5 million. The Debtor estimates that after reconciliation of such claims is complete and either negotiations or objections are concluded, remaining Class 2 Priority Non-Tax Claims against the Debtor will total approximately $700,000.

### 7. Class 3 (General Unsecured Claims)

Class 3 consists of General Unsecured Claims in the Chapter 11 Case that are asserted, filed or scheduled against the Debtor. Each Holder of an Allowed Class 3 Claim shall receive their *pro rata* share from the remaining portion of the Post-Confirmation Estate Fund, after satisfaction in full of senior Claims. The *pro rata* share of each Holder's Allowed Class 3 Claim shall be determined by a formula, the numerator of which is the then unsatisfied amount of such Holder's Class 3 Allowed Claim and the denominator of which is the aggregate unsatisfied amount of the remaining Allowed Class 3 Claims.

17

Distributions to Holders of Allowed Class 3 Claims shall be made by the Plan Administrator from the Post-Confirmation Estate Fund until all Allowed Class 3 Claims are paid in full.

Class 3 is Impaired and Holders of Class 3 Claims are therefore entitled to vote on the Plan.

As of the date of the Disclosure Statement, approximately 290,000 parties have filed or otherwise hold scheduled Class 3 Claims in the aggregate amount of approximately $~~2.5~~3.7 billion.[4] The Debtor estimates that after reconciliation of such claims is complete and either negotiations or objections are concluded, Allowed Class 3 Claims could range from approximately $70 million to an amount to be determined, which could be significantly in excess of that amount as a result of contingent, unliquidated and Disputed Claims for which the Debtor may be determined to be liable, in part or otherwise.

Prior to the Sale to NewCo, the Debtor conducted business in each of the fifty (50) states and the District of Columbia. Prior to the Petition Date, pursuant to applicable state law, the Debtor was required by each of the states and the District of Columbia to report checks issued for goods or services that remained uncashed for a specific period of time (the dormancy period) (collectively, "Unclaimed Property"). A typical example of Unclaimed Property is a check payable to a consumer on account of a refund for the return of certain merchandise that is mailed to the consumer's last known address and not cashed. Another example of Unclaimed Property is a check payable to a prize winner and not cashed.

All states have established unclaimed property reporting requirements that allow the state to take custody of dormant property. The state agencies hold the property while attempting to locate the owners of such property. Dormancy periods vary from state to state.

As of the Petition Date, the Debtor owed various state agencies and individuals approximately $11,00,000 in Unclaimed Property representing over 750,000 checks that have not been cashed.

State agencies responsible for administering the unclaimed property are general unsecured creditors with respect to any Unclaimed Property liabilities that have reached dormancy as of the Petition Date. Each state agency responsible for administering the Unclaimed Property liabilities was listed on Schedule F and is a Holder of a Class 3 Claim. The Debtor has calculated the general unsecured claim amount due to these various state agencies as of the Petition Date at approximately $5,000,000 in the aggregate.

Individuals are also general unsecured creditors with respect to any Unclaimed Property liabilities as of the Petition Date. There are over 300,000 checks for Unclaimed Property that were issued to approximately 288,000 individuals[5] that have not yet reached dormancy as of the Petition

---

[4] This total includes ~~two~~three claims filed by the same claimant each in the amount of $1 billion, which are subject to anticipated objections to be filed by the Debtor.

[5] There is a difference in the amount of checks issued and amount of individuals involved because certain individuals received multiple uncashed checks.

Date totaling approximately $6,~~00~~000,000 (collectively, the "Holders of Uncashed Checks"). The Holders of Uncashed Checks are Holders of Class 3 Claims.

**8. Class 4 (Equity Interests)**

Class 4 consists of the Equity Interests in the Debtor. Class 4 Equity Interests are Impaired as they will receive no Distribution under the Plan. Class 4 Equity Interests are deemed to reject the Plan and, as such, are not entitled to vote to accept or reject the Plan.

On the Effective Date, all Class 4 Equity Interests will be deemed canceled, null and void and of no force and effect.

**V.    MEANS OF IMPLEMENTING THE PLAN**

**A. Plan Funding**

The Plan shall be funded by a combination of the proceeds of the Sale and the proceeds from liquidation of remaining Assets, including accounts receivable. The Plan Administrator shall utilize the Post-Confirmation Estate Fund for purposes of making distributions to Holders of Allowed Claims after reserving for Disputed Claims.

**B. Appointment of Plan Administrator**

1. Appointment of Plan Administrator. The Confirmation Order shall provide for the appointment of the Plan Administrator. The Plan Administrator shall be deemed the Estate's exclusive representative in accordance with section 1123 of the Bankruptcy Code and shall have all powers, authority and responsibilities specified under sections 704 and 1106 of the Bankruptcy Code.

2. Bond. The Plan Administrator shall serve without a bond. The Oversight Committee, at its option, may require the Plan Administrator to obtain a bond, provided that there is sufficient Cash available in the Estate to purchase a bond.

3. Governance. The Plan Administrator shall be governed by the Plan and the Plan Administrator Agreement.

4. Succession Matters. In the event the Plan Administrator dies, is terminated, or resigns for any reason, the Oversight Committee shall designate a successor. If the Oversight Committee is unable to designate such a successor, the Bankruptcy Court may appoint a successor Plan Administrator from any candidate proposed by a party in interest. Such successor Plan Administrator shall be deemed to succeed the Plan Administrator in all respects, without the need for further order of the Bankruptcy Court. In the event of resignation or removal of the Plan Administrator, the departing Plan Administrator shall promptly (a) execute and deliver such documents, instruments and other writings as reasonably requested by the successor Plan Administrator or as ordered by the Bankruptcy Court; (b) turn over to the successor Plan Administrator all property of the Estate in his or her possession, custody and control, including,

19

but not limited to all funds held in bank accounts, and all files, books and records and other documents and information related to the Debtor; and (c) otherwise assist and cooperate in affecting the assumption of his or her obligations and functions by the successor Plan Administrator.  The successor Plan Administrator may, in his or her discretion, retain such professionals as he or she deems necessary, including the Professionals of the departing Plan Administrator.  If the Plan Administrator is replaced, the Professionals retained by the Plan Administrator shall be entitled to payment of their reasonable, undisputed fees and expenses from the Estate through the date of the Plan Administrator's replacement.

5.  <u>Funding of Plan Administrator's Activities</u>. The source of payment for the Plan Administrator and his or her professionals shall be from the Post Confirmation Estate Fund and any additional recoveries by the Estate after the confirmation of the Plan.

6.  <u>Indemnification</u>. The Plan Administrator and his or her designees, employees or professionals or any duly designated agent or representative of the Plan Administrator shall not be liable for any act or omission taken or omitted to be taken in their respective capacities other than for acts or omissions resulting from willful misconduct, gross negligence, or fraud as determined by Final Order of the Bankruptcy Court.  The Plan Administrator may, in connection with the performance of his or her functions, and in his or her sole and absolute discretion, consult with attorneys, accountants, financial advisors and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in good faith reliance on the advice or opinions rendered by such attorneys, accountants, financial advisors and agents, or any Final Order of the Bankruptcy Court.  Notwithstanding such authority, the Plan Administrator shall not be under any obligation to consult with attorneys, accountants, financial advisors or agents, and his or her determination not to do so shall not result in the imposition of liability, unless such determination is based on willful misconduct, gross negligence or fraud as determined by Final Order of the Bankruptcy Court.  The Debtor shall indemnify and hold harmless the Plan Administrator and his or her designees and Professionals, and all duly designated agents and representatives (in their capacity as such) from and against all liabilities, losses, damages, claims, costs and expenses, including, but not limited to attorneys' fees and costs arising out of or due to such actions or omissions, or consequences of their actions or omissions with respect or related to the performance of their duties or the implementation or administration of the Plan; <u>provided</u> <u>however</u>, that no such indemnification will be made to such Persons for such actions or omissions as a result of willful misconduct, gross negligence or fraud.

**C.  <u>Powers and Duties of Plan Administrator</u>**

1.  <u>Powers and Duties</u>. On the Effective Date, the Plan Administrator shall succeed to all of the rights of the Debtor and the Estate as otherwise provided herein, with all powers necessary to protect, conserve, and liquidate all Assets, including, without limitation, control over (including the right to waive) all attorney-client privileges, work-product privileges, accountant-client privileges and any other evidentiary privileges relating to the Assets that, prior to the Effective Date, belonged to the Debtor pursuant to applicable law.  The powers and duties of the Plan Administrator shall include, without further order of the Court, except where expressly stated otherwise, the rights:

i.  to open and close bank accounts for the Debtor and its Estate as the sole signatory, invest Cash in accordance with section 345 of the Bankruptcy Code, and withdraw and make distributions of Cash to Holders of Allowed Claims and pay taxes and other obligations in connection with the wind-down of the Estate in accordance with the Plan;

ii.  to engage attorneys, consultants, agents, employees and all professional persons, to assist the Plan Administrator with respect to the Plan Administrator's responsibilities, including professional persons that may have represented the Debtor or the Official Committee prior to confirmation of the Plan;

iii.  to execute and deliver all documents, and take all actions, necessary to consummate the Plan and wind-down the Estate;

iv.  to act on behalf of the Debtor and its Estate in all adversary proceedings and contested matters (including, without limitation, any Avoidance Actions and Causes of Action) then pending or that can be commenced in the Court and in all actions and proceedings pending or commenced elsewhere, and, subject to consultation with the Oversight Committee as stated below, to settle, retain, enforce, or dispute any adversary proceedings or contested matters (including, without limitation, any Causes of Action) and otherwise pursue actions involving Assets that could arise or be asserted at any time under the Bankruptcy Code or otherwise, unless otherwise specifically waived or relinquished in the Plan;

v.  to investigate the financial affairs of the Debtor and any of its affiliates, parents, partners, or subsidiaries, including through the issuance of formal subpoenas pursuant to Bankruptcy Rule 2004 without the need for the issuance of additional Bankruptcy Court orders beyond the Confirmation Order;

vi.  upon consultation with the Oversight Committee, to determine whether to bring, settle, release, or compromise Avoidance Actions and Causes of Action without the need for Court approval (all compromises must be approved by the Oversight Committee or the Court to the extent the Oversight Committee objects);

vii.  to dispose of, and deliver title to or otherwise realize the value of, all the remaining Assets without the need for approval of the Bankruptcy Court;

viii.  to coordinate the storage, maintenance and disposal of the Records as he or she determines in his or her reasonable discretion in compliance with any applicable state and federal rules;

ix.  to dissolve the Debtor in accordance with Section 5.12 of the Plan;

x.  to oversee compliance with the Debtor's accounting, finance and reporting obligations;

xi.  to prepare United States Trustee quarterly reports and financial statements, and such other reports and financial statements as may be necessary or helpful to the Plan

Administrator to carry out his or her duties, and to manage the calculation and disbursement of U.S. Trustee fees;

xii.   to oversee the filing of final tax returns, audits and other corporate dissolution documents if required;

xiii.  upon consultation with the Oversight Committee, to object to Claims against the Debtor;

xiv.   with the Oversight Committee, to compromise and settle Claims by and against the Debtor and its Estate without the need for Bankruptcy Court approval (to the extent the Oversight Committee declines to approve a compromise recommended by the Plan Administrator, the Plan Administrator may seek Bankruptcy Court approval of such compromise over the objection of the Oversight Committee);

xv.    to perform any additional corporate actions as necessary to carry out the wind-down, liquidation and ultimate dissolution of the Debtor;

xvi.   to implement and/or enforce all provisions of the Plan;

xvii.  to implement and/or enforce all agreements entered into prior to the Effective Date;

xviii. upon consultation with the Oversight Committee, to abandon any Assets without the need for approval of the Court, and upon such abandonment, such Assets shall cease to be Assets of the Estate; and

xix.   to use such other powers as may be vested in or assumed by the Plan Administrator pursuant to the Plan or Order of the Bankruptcy Court or as may be necessary and proper to carry out the provisions of the Plan.

**D.  Establishment of Oversight Committee**

1.  Appointment of Oversight Committee. On or after the Effective Date, the Oversight Committee shall be appointed and shall consist of Holders of Allowed Class 3 Claims willing to serve.  Members of the Oversight Committee will be selected by the Official Committee, or the Plan Administrator as the case may be, upon consultation with the U.S. Trustee.  The Oversight Committee shall not exceed five (5) members.  The Oversight Committee shall have the authority specified in the Plan and Plan Administrator Agreement.  Any actions taken by the Oversight Committee shall be by majority vote.  The Plan Administrator shall consult with and provide information to the Oversight Committee with respect to any material action to be taken or not to be taken by the Plan Administrator as set forth in the Plan and the Plan Administrator Agreement.

2.  Reimbursement of Costs and Expenses. Except for the reimbursement of reasonable, actual costs and expenses incurred in connection with their duties as members of the Oversight Committee, the members of the Oversight Committee shall serve without compensation. Reasonable expenses incurred by members of the Oversight Committee may be paid by the Plan

Administrator upon presentation of proper documentation without the need for Court approval. Reasonable expenses incurred by members of the Oversight Committee may be paid by the Plan Administrator upon presentation of proper documentation without the need for Court approval. To the extent that the Oversight Committee declines to approve a settlement proposed by the Plan Administrator and the Plan Administrator opts to seek Bankruptcy Court approval of the settlement over the objection of the Oversight Committee, then the Oversight Committee may retain attorneys to prosecute its objection, the reasonable costs of which will be paid by the Plan Administrator in the same manner as the Plan Administrator's professionals.

       3.   <u>Liability of Members of the Oversight Committee</u>. Subject to any applicable law, the members of the Oversight Committee shall not be liable for any act done or omitted by any member in such capacity, while acting in good faith and in the exercise of business judgment. Members of the Oversight Committee shall not be liable in any event except for gross negligence or willful misconduct in the performance of their duties hereunder.

       4.   <u>Indemnification</u>. Except as otherwise set forth in the Plan and to the extent permitted by applicable law, the members of the Oversight Committee shall not be liable for any act or omission taken or omitted to be taken in their respective capacities other than for acts or omissions resulting from willful misconduct, gross negligence, or fraud as determined by Final Order of the Bankruptcy Court. The Estate shall indemnify and hold harmless the members of the Oversight Committee from and against all liabilities, losses, damages, claims, costs and expenses, including, but not limited to attorneys' fees and costs arising out of or due to such actions or omissions, or consequences of their actions or omissions with respect or related to the performance of their duties; provided however, that no such indemnification will be made to such Persons for such actions or omissions as a result of willful misconduct, gross negligence or fraud.

**E.   <u>Establishment of Disputed Claims Reserve</u>**

      <u>Disputed Claims Reserve</u>. As soon as practicable following the Effective Date, the Disputed Claims Reserve shall be established by the Plan Administrator if and as required; provided, however, that the Plan Administrator shall have no obligation to fund the Disputed Claims Reserve until, at the latest, immediately prior to the making of a Distribution to Holders of Allowed Claims of the same Class as the Disputed Claims. The Disputed Claims Reserve shall be funded from available Cash in an amount equal to the amount Holders of Disputed Claims would have otherwise been entitled but for the dispute. The assets in the Disputed Claims Reserve shall be held separately from other assets held by the Plan Administrator subject to an allocable share of all expenses and obligations, on account of Disputed Claims. Funds shall be removed from the Disputed Claims Reserve as the Disputed Claims are resolved, which funds shall be distributed as provided in Section 9.20 of the Plan. Notwithstanding any other provision of the Plan to the contrary, subject to definitive guidance from the Internal Revenue Service or a court of competent jurisdiction to the contrary, the Plan Administrator may treat any assets allocable to, or retained on account of, the Disputed Claims Reserve as held by one or more discrete entities holding Disputed Claims for federal, and applicable state, local or other, income tax purposes, and may determine that such entity or entities shall constitute "disputed ownership funds" under, and may make the election permitted by, Treasury Regulation 1.468B-9, or any successor provision thereto.

**F.** **Preservation of Causes of Action**

Except as otherwise provided in the Plan or in any contract, instrument, release or agreement entered into in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, all Claims or Causes of Action that the Debtor or the Estate may have against any person or entity are preserved, including without limitation any and all Causes of Action under sections 502, 510, 522(f), 522(h), 542, 543, 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code.

**G.** **General Disposition of Assets**

Pursuant to section 1123(a)(5) of the Bankruptcy Code and subject to the terms of the Plan, as soon as is reasonably practicable following the Effective Date, the Plan Administrator shall sell or otherwise dispose of, and liquidate to or otherwise convert to Cash, any non-Cash Assets in such manner as the Plan Administrator shall determine is in the best interests of the Estate and Holders of Allowed Claims.

**H.** **Exemption from Certain Transfer Taxes**

To the maximum extent provided by section 1146(a) of the Bankruptcy Code, any post-Confirmation sale or transfer of any of the Assets, or any sale or transfer of, from or by the Debtor, pursuant to, in contemplation of, or in connection with the Plan or pursuant to the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instruments of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, in each case to the extent permitted by applicable bankruptcy law, and the appropriate state or local government officials or agents shall forego collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**I.** **Administrative Expense Claims Bar Date**

With the exception of Professional Fee Claims and Ordinary Course Professional Claims, persons asserting an Administrative Expense Claim must file a request for payment of such Administrative Expense Claim on or before 5:00 p.m. prevailing Eastern Time on the date that is 30 days after notice of the Effective Date has been mailed (the "Administrative Expense Claims Bar Date"). No payment or Distributions will be made on account of any Administrative Expense Claim until such Claim becomes an Allowed Claim. Any person asserting an Administrative Expense Claim that fails to file and serve an Administrative Expense Claim on or before the Administrative Expense Claims Bar Date shall be forever barred from asserting any such right to payment against the Debtor, its Estate, the Plan Administrator, or the Oversight Committee.

24

**J.** **Deadline for Filing Applications For Payment of Professional Fee Claims**

All parties seeking payment of Professional Fee Claims arising prior to the Effective Date must file with the Bankruptcy Court a final application and/or an application for payment of reasonable fees and expenses on or before the date that is 30 days after notice of the Effective Date has been mailed (the "Fee Application Deadline"). Any Professional failing to file and serve such application on or before the Fee Application Deadline shall be forever barred from asserting any such right to payment against the Debtor, its Estate, the Plan Administrator, or the Oversight Committee.

**K.** **Execution of Documents to Effectuate Plan**

From and after the Effective Date, the Plan Administrator shall have the exclusive power and authority to execute any instrument or document to effectuate the provisions of the Plan. Entry of the Confirmation Order shall authorize the Plan Administrator to take, or cause to be taken, all actions necessary or appropriate to consummate and implement the provisions of the Plan. All such actions shall be deemed to have occurred and shall be in effect pursuant to applicable non-bankruptcy law and the Bankruptcy Code, without any requirement of further action.

**L.** **Dissolution of the Debtor**

Following the Effective Date, the Debtor, through the activities of the Plan Administrator, shall continue in existence for the purposes of, among other things, completing the liquidation of Assets, winding up affairs and filing appropriate tax returns. Upon the entry of an order closing the case, the Debtor shall be deemed dissolved for all purposes. No other actions or filings or payments shall be required in furtherance of such dissolution.

Upon the Effective Date, the Debtor's board of directors shall be dissolved and the members thereof shall have no further obligation or duty with respect to the Debtor, the Estate or the Chapter 11 Case.

**M.** **Post-Confirmation Reports and Fees**

Reporting to Office of the United States Trustee. Following the Effective Date and until the Chapter 11 Case is closed, not less than once every ninety (90) days, the Plan Administrator shall file all post-Effective Date reports required during such periods and shall pay from the Post-Confirmation Estate Fund all post-Effective Date fees charged or assessed against the Estate under 28 U.S.C. § 1930 during such periods together with applicable interest pursuant to 31 U.S.C. § 3717.

**N.** **Official Committee**

On the Effective Date, the Official Committee shall be deemed to be dissolved and the members of the Official Committee shall be released and discharged from all duties and obligations arising from or related to the Chapter 11 Case, provided, however, that the Official Committee shall remain in existence for the purpose of reviewing and approving fee applications of Professionals.

**O.  Insurance Preservation**

Nothing in the Plan shall diminish or impair the enforceability of any Insurance Policies that may cover Claims against the Debtor or any other Person.

**P.  Claims Administration Responsibility**

1.  <u>Reservation of Rights</u>.  Unless a Claim is specifically Allowed prior to or after the Effective Date, prior to the Effective Date, the Debtor, and after the Effective Date, the Plan Administrator, reserve any and all objections to any and all Claims and motions or requests for the payment of Claims, whether administrative expense, secured or unsecured, including without limitation any and all objections to the validity or amount of any and all alleged Administrative Expense Claims, Priority Tax Claims, or Priority Non-Tax Claims, liens and security interests, whether under the Bankruptcy Code, other applicable law or contract.  The failure to object to any Claim prior to the Effective Date shall be without prejudice to the Plan Administrator's rights to contest or otherwise defend against such Claim in the Bankruptcy Court when and if such Claim is sought to be enforced by the Holder of the Claim.

2.  <u>Objections to Claims</u>.  Prior to the Effective Date, the Debtor shall be responsible for pursuing any objection to the allowance of any Claim.  From and after the Effective Date, the Plan Administrator may dispute, object to, compromise or otherwise resolve all Claims, in accordance with Sections 5.2 and 5.3 of the Plan.  Unless otherwise provided in the Plan or ordered by the Bankruptcy Court, all objections to Claims shall be filed and served no later than one hundred eighty (180) days after the Effective Date, provided that the Plan Administrator may request (and the Bankruptcy Court may grant) one or more extensions of time by filing a motion with the Bankruptcy Court prior to the expiration of such period.

3.  <u>Filing Objections</u>.  An objection to a Claim shall be deemed properly served on the claimant if the Debtor or Plan Administrator, as applicable, effect service of any such objection in accordance with Rule 3007 of the Bankruptcy Rules by mailing or otherwise delivering the objection and a notice of hearing thereon to the claimant at the address set forth on such claimant's Proof of Claim at least thirty (30) days prior to the hearing thereon. The Debtor or the Plan Administrator may also effectuate service of an objection to a claim: (i) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004; (ii) to the extent counsel for a claimant is unknown, by first class mail, postage prepaid, to the signatory on the Proof of Claim or interest or other representative identified on the Proof of Claim or interest or any attachment thereto or; (iii) by first class mail, postage prepaid, on counsel that has appeared on the behalf of the claimant in the Chapter 11 Case.

4.  <u>Determination of Claims</u>.  Except as otherwise agreed by the Debtor or Plan Administrator, any Claim as to which a Proof of Claim or motion or request for payment was timely filed in the Chapter 11 Case may be determined and liquidated after the Effective Date pursuant to (i) an order of the Bankruptcy Court (which order has not been stayed, reversed or amended and as to which determination or any revision, modification or amendment thereof, and the time to appeal or seek review or rehearing thereof, has expired, and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending), or (ii) applicable non-

26

bankruptcy law.  Any Claim determined to be an Allowed Claim after the Effective Date pursuant to this section of the Plan shall be treated as an Allowed Claim in accordance with the Plan.

**Q. Treatment of Claims without Further Order of the Court**

1. <u>Certain Scheduled Claims</u>.  As of the Effective Date, any Scheduled Claim designated as disputed, contingent or unliquidated in amount, and for which a Proof of Claim has not been filed by the Creditor, shall be deemed Disallowed and expunged.  All Scheduled Claims that correspond to a timely filed Proof of Claim filed by a particular Creditor shall be deemed to have been superseded by such later timely filed Proof of Claim and the Scheduled Claims, regardless of priority, shall be expunged from the claims register; <u>provided</u> <u>however</u>, that such Proofs of Claim shall be subject to objection in accordance with Section 9.15 of the Plan.

2. <u>Late Filed Claims</u>.  Any and all Proofs of Claim filed after the applicable Claims Bar Date shall be deemed Disallowed as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any Distributions on account of such Claims, unless on or before the Confirmation of the Plan, such later Claim has been deemed timely filed by a Final Order.

**R. Timing of Distributions on Disputed Claims Subsequently Allowed**

In the event that a Disputed Claim is Allowed, in whole or in part, after the Effective Date, a Distribution shall be made on account of such Allowed Claim on the next Distribution Date that is at least fifteen (15) business days after such Claim is Allowed.

**S. No Payment or Distribution of Disputed Claim**

Notwithstanding any provision to the contrary herein, no payments or other Distributions shall be made on account of any Disputed Claim, or any portion thereof, unless and until such Claim or some portion thereof is allowed by Final Order of the Bankruptcy Court.  For the avoidance of doubt, no portion of any Disputed Claim is entitled to a Distribution.  Holders of Disputed Claims shall be bound, obligated and governed in all respects by the Plan.

**T. Disputed Claims**

1. Except to the extent the Bankruptcy Court determines that a lesser amount is adequate, the Plan Administrator shall, on each Distribution Date, deposit in a Disputed Claims Reserve, Cash equal to the Distributions that would have been made to Holders of Disputed Claims if such Claims were Allowed Claims in their full amounts or such lower amount as to which the Holder of such Claim has agreed in writing, and in the case where any such Claim is unliquidated and/or contingent, the greater of (i) $1 and (ii) such other amount as is reserved by order of the Bankruptcy Court made upon motion of the Debtor, the Plan Administrator, or the Holder of such Claim.

2. For purposes of effectuating the provisions of Section 9.17 of the Plan and the Distributions to Holders of Allowed Claims, the Bankruptcy Court, upon the request of any Holder of a Claim, on the one hand, or the Plan Administrator, on the other hand, may estimate the amount

of Disputed Claims pursuant to section 502(c) of the Bankruptcy Code, in which event the amounts estimated shall be deemed to be the aggregate amounts of the Disputed Claims pursuant to section 502(c) of the Bankruptcy Code for purposes of Distribution under the Plan and for purposes of the Disputed Claims Reserve.

    3.  When a Disputed Claim becomes an Allowed Claim, there shall be distributed to the Holder of such Allowed Claim, in accordance with the provisions of the Plan (but in no event later than the next succeeding Distribution Date), Cash in the amount of all Distributions to which such Holder would have been entitled if such Holder's Claim were Allowed on the Effective Date, to the extent of available Cash to make such Distribution.

    4.  In no event shall any Holder of any Disputed Claim be entitled to receive (under the Plan or otherwise) any Cash payment which is greater than the amount reserved, if any, for such Disputed Claim pursuant to Section 9.17 of the Plan.  In no event shall the Plan Administrator have any responsibility or liability for any loss to or of any amount reserved under the Plan unless such loss is the result of that party's fraud, willful misconduct, or gross negligence.  In no event may any Creditor whose Disputed Claim is subsequently allowed, pursue or recover in or from any other Creditor in respect of any funds received as Distributions under the Plan.

    5.  To the extent that a Disputed Claim ultimately becomes an Allowed Claim and is entitled to a Distribution in an amount less than the amount reserved for such Disputed Claim, then on the next succeeding Distribution Date, the Plan Administrator shall make, in accordance with the terms of the Plan, a Distribution of the excess amount reserved for such Disputed Claim.

    6.  Any Disputed Claims Reserve shall be treated as a disputed ownership fund, within the meaning of Treasury Regulation section 1.468B-9, for all purposes associated with taxation.

**U.  Limitations on Funding of Disputed Claims Reserve**

Except as expressly set forth in the Plan, or otherwise agreed to in writing or ordered by the Court, the Plan Administrator shall have no obligation or duty to fund the Disputed Claims Reserve.

**V.  Tax Requirements for Income Generated by Disputed Claims Reserve**

The Plan Administrator shall pay, or cause to be paid, out of the funds held in a Disputed Claims Reserve, any tax imposed by any federal, state, or local taxing authority on the income generated by the funds or property held in a Disputed Claims Reserve.  The Plan Administrator shall file, or cause to be filed, any tax or information return related to a Disputed Claims Reserve that is required by any federal, state, or local taxing authority.

**VI.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

**A.  General Provisions**

All executory contracts and unexpired leases of the Debtor shall be deemed rejected as of the Effective Date, unless a particular executory contract or unexpired lease (i) has previously been

28

assumed, assumed and assigned, or rejected pursuant to order of the Bankruptcy Court or applicable provisions of the Bankruptcy Code, or (ii) has expired or otherwise terminated pursuant to its terms.

**B. <u>Notice of Deemed Rejection/Rejection Bar Date</u>**

Any party to an executory contract or unexpired lease that is rejected in accordance with Section 6.1 of the Plan shall file a Proof of Claim for damages from such rejection no later than thirty (30) days after the Effective Date. The failure to timely file a Proof of Claim shall be deemed a waiver of any Claim in connection with the rejection of such contract or lease.

**C. <u>Compensation and Benefit Programs</u>**

To the extent not previously terminated, all employment and severance agreements and policies, and all employee compensation and benefit plans, policies and programs of the Debtor applicable generally to their employees, independent contractors or officers in effect on the Effective Date, including, without limitation, all savings plans, retirement plans, health care plans, disability plans, severance benefit plans, incentive plans and life, accidental death and dismemberment insurance plans, shall be terminated as of the Effective Date.

**VII. <u>INJUNCTIONS; EXCULPATIONS</u>**

**A. <u>General Injunctions</u>**

**The following provisions shall apply and shall be fully set forth in the Confirmation Order.**

**1. Injunctions Against Interference with Consummation or Implementation of Plan**

**All Holders of Claims shall be enjoined from commencing or continuing any judicial or administrative proceeding or employing any process against the Debtor, the Estate, the Plan Administrator, or the Oversight Committee (and its members) with the intent or effect of interfering with the consummation and implementation of the Plan and the transfers, payments and Distributions to be made hereunder.**

**2. Plan Injunction**

**Except as otherwise specifically provided for by the Plan, as of and from the Effective Date, all Persons shall be enjoined from (i) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order; (ii) the creation, perfection or enforcement of any encumbrance of any kind; and/or (iii) the assertion of any right of setoff, counterclaim, exculpation, or subrogation of any kind, in each case against the Debtor, the Estate, the Plan Administrator, or the Oversight Committee (and its members) to the fullest extent authorized or provided by the Bankruptcy Code.**

29

### 3. Release of Collateral

Except as expressly provided otherwise in the Plan, (i) unless a Holder of a Secured Claim receives a return of its Collateral in respect of such Claim under the Plan, each Holder of (A) an Allowed Secured Claim; and (B) an Allowed Claim that is purportedly secured, on the Effective Date shall (x) turn over and release to the Debtor any and all property that secures or purportedly secures such Claim; and (y) execute such documents and instruments as the Debtor requires to evidence such claimant's release of such property; and (ii) on the Effective Date, all claims, rights, title and interest in such property shall revert to the Debtor, free and clear of all Claims against the Debtor, including (without limitation) liens, charges, pledges, encumbrances and/or security interests of any kind. No Distribution hereunder shall be made to or on behalf of any Holder of such Claim unless and until such Holder executes and delivers to the Debtor such release of liens. Any such Holder that fails to execute and deliver such release of liens within 60 days of any demand thereof shall be deemed to have no further Claim and shall not participate in any Distribution hereunder. Notwithstanding the immediately preceding sentence, a Holder of a Disputed Claim shall not be required to execute and deliver such release of liens until the time such Claim is Allowed or Disallowed.

### B. Exculpation

As of the Confirmation Date, the Debtor and its professionals (including professional firms and individuals within such firms) shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code. To the fullest extent permitted by section 1125(e) of the Bankruptcy Code, the Debtor and its professionals (including professional firms and individuals within such firms), shall not have or incur any liability to any Holder of any Claim or any other Person for any act or omission taken or not taken in good faith in connection with, or arising out of, the Chapter 11 Case, the Disclosure Statement, the Plan, or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan, or any act taken or omitted to be taken during the Chapter 11 Case, the solicitation of votes for and the pursuit of confirmation of the Plan, the consummation of the Plan, including, without limitation, the steps taken to effectuate the transactions described in Article 5 of the Plan, the administration of the Plan or the property to be distributed under the Plan, except for acts or omissions constituting fraud, willful misconduct or gross negligence as determined by a Final Order; and in all respects such parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

### C. All Distributions Received in Full and Final Satisfaction

Except as otherwise set forth herein, all payments, all Distributions to be made in accordance with the Plan on account of Claims, and all rights conferred under the Plan shall be received in full and final satisfaction of the Estate's obligations for such Claims as against the Debtor, its property and the Estate.

**D.  No Modification**

The provisions of this Section 7 (Article 8 of the Plan) are not intended, and shall not be construed, to modify the res judicata effect of any order entered in the Chapter 11 Case, including, without limitation, the Confirmation Order and any order finally determining Professional Fee Claims to any Professional.

**E.  No Discharge of Claims.**

Pursuant to section 1141(d)(3) of the Bankruptcy Code, the Confirmation Order will not discharge the Debtor of any debts.

**VIII.  CONDITIONS PRECEDENT**

~~F.~~A.  **Conditions Precedent to Confirmation of the Plan.**

The following conditions must be satisfied, or otherwise waived in accordance with Section 7.3 of the Plan, on or before the Confirmation Date:

1.  The Disclosure Statement Approval Order shall have been entered and shall have become a Final Order; and
2.  The Confirmation Order shall have been entered and contain provisions that, among other things:

   (i)  authorizes the implementation of the Plan in accordance with its terms;

   (ii)  approves in all respects the other settlements, transactions, and agreements to be effected pursuant to the Plan;

   (iii)  finds that the Plan complies with all applicable provisions of the Bankruptcy Code, including that the Plan was proposed in good faith and that the Confirmation Order was not procured by fraud;

   (iv)  approves the Plan Administrator Agreement; and

   (v)  establishes the Administrative Expense Claims Bar Date.

~~G.~~B.  **Conditions Precedent to the Effective Date.**

The Effective Date shall not occur and no obligations under the Plan shall come into existence, unless each of the following conditions is met or, alternatively, is waived in accordance with Section 7.3 of the Plan, on or before the Effective Date:

1.  The Confirmation Order shall have become a Final Order;

2.  The Confirmation Order shall have authorized and approved the appointment of the Plan Administrator and the Oversight Committee; and

31

    3.   The Debtor shall have sufficient Cash on hand to pay all Administrative Expense
Claims.

## ~~H.~~C.       **Waiver of Conditions Precedent**

Each of the conditions precedent in Sections 7.1 and 7.2 of the Plan may be waived or
modified without further Court approval, in whole or in part, but only with the consent of the
Debtor.

## IX.    PROCEDURES FOR DISTRIBUTIONS UNDER PLAN

Article 9 of the Plan establishes the procedures and guidelines for Distributions to be made
to the terms of the Plan to the Holders of Claims, including the timing, procedures and notice
provisions related to same. Distributions shall be made by the Plan Administrator as follows.

### A.  **Distributions by Plan Administrator**

The Plan Administrator shall make Distributions on account of Allowed Claims in
accordance with Article 4 of the Plan. The Plan Administrator may use the services of a third party
to aid in the Distributions required to be made under the Plan, including the Distribution Agent.

### B.  **Indefeasibility of Distributions**

All Distributions made under the Plan shall be indefeasible.

### C.  **Frequency of Distributions**

The Plan Administrator shall make Distribution(s) on account of Allowed Class 3 Claims
in accordance with Article 4 of the Plan as soon as practicable after the Effective Date and at such
other times as may be determined to be appropriate by the Plan Administrator in consultation with
the Oversight Committee.

### D.  **Payments in U.S. Dollars**

All Cash payments required under the Plan shall be made in U.S. dollars by checks drawn
on domestic bank(s) selected by the Plan Administrator in accordance with the Plan or by wire
transfer from a domestic bank.

### E.  **Claims In U.S. Dollars**

Any Claims asserted in foreign currencies shall be converted to United States Dollars in
accordance with the prevailing exchange rates published by the Wall Street Journal on the
Confirmation Date.

**F.  Distributions Only on Business Days**

Notwithstanding the foregoing provisions, if any Distribution called for under the Plan is due on a day other than a Business Day, then such Distribution shall instead be due the next Business Day.

**G.  Transmittal of Payments and Notices**

Except as otherwise provided in the Plan, all Distributions shall be made to the Holder of a Claim by regular first-class mail, postage prepaid, in an envelope addressed to such Holder at the address listed on its Proof of Claim filed with the Bankruptcy Court or, if no Proof of Claim was filed, (i) at the address listed on the Debtor's Schedules, or (ii) at such address that a Holder of a Claim provides to the Plan Administrator after the Effective Date in writing at least fifteen (15) business days prior to a Distribution Date. The Plan Administrator shall be under no obligation to ascertain the mailing address of any Holder of a Claim other than as set forth herein. The date of payment or delivery shall be deemed to be the date of mailing.  Payments made in accordance with the provisions of this Section of the Plan shall be deemed made to the Holder regardless of whether such Holder actually receives the payment.

**H.  Record Date for Distributions**

Except as otherwise provided in a Final Order of the Bankruptcy Court, transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 with appropriate filings made on or before the Effective Date (the "Distribution Record Date") shall be treated as the Holders of those Claims for all purposes of the Plan, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to the transfer(s) may not have expired prior to the Distribution Record Date. The Plan Administrator shall be under no obligation to recognize any transfer of any Claim occurring after the Distribution Record Date. In making a Distribution with respect to any Claim, the Plan Administrator shall be entitled to recognize and deal for all purposes hereunder only with the Person who is listed on the Proof of Claim filed with respect to such Claim, on the Schedules as the Holder thereof, and upon such other evidence or record of transfer or assignment filed as of the Distribution Record Date.

**I.  Unclaimed Distributions**

Unclaimed Distributions, including Distributions made by checks that fail to be cashed or otherwise negotiated within ninety (90) days after the Distribution Date or which Distributions are returned to the Plan Administrator as undeliverable to the addresses of record as of the Distribution Record Date, shall be canceled (by a stop payment order or otherwise), the Claim(s) relating to such Distribution(s) shall be deemed forfeited and expunged without any further action or order of the Bankruptcy Court.  Any such Unclaimed Distributions shall, as soon as is practicable, be redistributed pursuant to the provisions of the Plan.

**J.  No Payments of Fractional Cents or Distributions of Less Than One Hundred Dollars**

1. Notwithstanding any provision to the contrary herein, for purposes of administrative convenience, no payment of fractional cents shall be made pursuant to the Plan.

33

Whenever any payment of a fraction of a cent under the Plan would otherwise be required, the actual Distribution made shall reflect a rounding of such fraction to the nearest whole penny (up or down), with a half-penny or less being rounded down and fractions in excess of half of a penny being rounded up.

2. Notwithstanding any provision to the contrary herein, for purposes of administrative convenience, no Distribution of less than One Hundred Dollars ($100) shall be made pursuant to the Plan. Whenever any Distribution of less than One Hundred Dollars ($100) under the Plan would otherwise be required, such funds will be retained by the Plan Administrator for the account of the recipient until such time that successive Distributions aggregate to One Hundred Dollars ($100), at which time such payment shall be made, and if successive Distributions do not ever reach One Hundred Dollars ($100) in the aggregate, then such Distributions shall revert to the Estate and be redistributed in accordance with the Plan.

**K. Setoff and Recoupment**

Except as otherwise provided in the Plan, the Plan Administrator may, but shall not be required to, set off against, or recoup from, any Claim and the Distributions to be made pursuant to the Plan in respect thereof, any Claims, defenses or Causes of Action of any nature whatsoever that the Plan Administrator may have, but neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Plan Administrator of any right of setoff or recoupment against the Holder of any Claim.

**L. Payment of Taxes on Distributions Received Pursuant to the Plan**

1. The Debtor shall provide the Plan Administrator with all available tax identification or social security numbers that they may possess for Creditors (collectively the "Tax Information") and the Plan Administrator may rely upon the same for purposes of Distributions and associated tax reporting and compliance.  Notwithstanding any provision to the contrary herein, as a condition to payment of any Distribution to a Creditor under the Plan, each Creditor shall provide a valid Tax Information if requested by the Plan Administrator for purposes of tax reporting.  All Persons that receive Distributions under the Plan shall be responsible for reporting and paying, as applicable, any taxes on account of their Distributions.

2. At such time as the Plan Administrator believes that Distributions to a particular Class of Claims is likely, the Plan Administrator shall review the available Tax Information provided by the Debtor and where necessary, request Tax Information in writing from Creditors (the "Tax Information Request").  Any Creditor who fails to respond to Tax Information Request within ninety (90) days from the date posted on the Tax Information Request, shall forfeit all Distributions such Creditor may otherwise be entitled to under the Plan and such forfeited funds will revert to the Debtor to be disbursed in accordance with the terms and priorities established in the Plan.

**Formatted:** List Paragraph, Left

**M.** **Compliance With Tax Withholding and Reporting Requirements**

With respect to all Distributions made under the Plan, the Plan Administrator will comply with all withholding and reporting requirements of any federal, state, local or foreign taxing authority.

**N.** **Disputed Distribution**

If a dispute arises as to the identity of a Holder of an Allowed Claim who is to receive a Distribution, the Plan Administrator may, in lieu of making such Distribution to such Holder, hold such amount until the dispute is resolved by Final Order of the Bankruptcy Court or by written agreement among the parties to such dispute.

**X.** **RETENTION OF JURISDICTION BY BANKRUPTCY COURT**

From the Confirmation Date until entry of a final decree closing the Chapter 11 Case, the Bankruptcy Court shall retain such jurisdiction as is legally permissible over the Chapter 11 Case for the following purposes:

1.   to hear and determine any and all objections to the allowance of any Claim, or any controversy as to the classification of Claims or any matters which may directly, indirectly or contingently affect the obligations of the Debtor to any Creditors, Holders of Claims, or other parties in interest;

2.   to hear and determine any and all applications for compensation and reimbursement of expenses by Professionals;

3.   to hear and determine any and all pending motions for the assumption or rejection of executory contracts and unexpired leases, and to fix any Claims resulting therefrom;

4.   to adjudicate through final judgment such contested matters and adversary proceedings as may be pending or subsequently initiated in the Court including, but not limited to, the Causes of Action;

5.   to enforce and interpret the provisions of the Plan, the Confirmation Order, and the Plan Administrator Agreement;

6.   to hear and determine any matters relating to the appointment and replacement of the Plan Administrator;

7.   to issue any injunction or other relief appropriate to implement the intent of the Plan, and to enter such further orders enforcing any injunctions or other relief issued under the Plan or pursuant to the Confirmation Order;

8.   to modify the Plan pursuant to section 1127 of the Bankruptcy Code and the applicable Bankruptcy Rules;

9.  to correct any defect, cure any omission, or reconcile any inconsistency in the Plan, the Confirmation Order, or the Plan Administrator Agreement, as may be necessary to carry out the purposes and the intent of the Plan;

10. to interpret and determine such other matters as the Confirmation Order may provide for, or as may be authorized under the Bankruptcy Code;

11. to enter and implement such orders as may be appropriate in the event the Confirmation Order is, for any reason, stayed, reversed, revoked, modified or vacated; and

12. to adjudicate any disputes between the members of the Oversight Committee or between the Oversight Committee and the Plan Administrator.

## XI.    CERTAIN TAX CONSEQUENCES OF THE PLAN

### A.  General

THE DESCRIPTION OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN PROVIDED BELOW IS LIMITED TO THE SPECIFIC FEDERAL INCOME TAX MATTERS DESCRIBED HEREIN.   IT IS POSSIBLE THAT ADDITIONAL ISSUES MAY EXIST THAT COULD AFFECT THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN OR OTHER FEDERAL INCOME TAX MATTERS DISCUSSED HEREIN AND THIS DISCUSSION DOES NOT CONSIDER OR PROVIDE ANY CONCLUSIONS WITH RESPECT TO ANY SUCH ADDITIONAL ISSUES. EACH TAXPAYER IS STRONGLY URGED TO SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM SUCH TAXPAYER'S INDEPENDENT TAX ADVISOR.

THE DESCRIPTION OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN PROVIDED BELOW IS SOLELY FOR THE PURPOSE OF COMPLIANCE WITH SECTION 1125(a) OF THE BANKRUPTCY CODE. THE DESCRIPTION IS BASED ON THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "INTERNAL REVENUE CODE") TREASURY REGULATIONS, JUDICIAL DECISIONS AND ADMINISTRATIVE DETERMINATIONS, ALL AS IN EFFECT ON THE DATE OF THIS DISCLOSURE STATEMENT. CHANGES IN ANY OF THESE AUTHORITIES OR IN THEIR INTERPRETATION MAY HAVE RETROACTIVE EFFECT, WHICH MAY CAUSE THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO DIFFER MATERIALLY FROM THE CONSEQUENCES DESCRIBED BELOW.   NO RULING HAS BEEN REQUESTED FROM THE INTERNAL REVENUE SERVICE (THE "IRS") AND NO LEGAL OPINION HAS BEEN REQUESTED FROM COUNSEL CONCERNING ANY TAX CONSEQUENCE OF THE PLAN, AND NO TAX OPINION OR ADVICE IS GIVEN BY THIS DISCLOSURE STATEMENT.

This description does not cover all aspects of federal income taxation that may be relevant to the Debtor or Holders of Claims.  For example, the description does not address issues of special concern to certain types of taxpayers, such as dealers in securities, life insurance companies,

36

financial institutions, tax exempt organizations and foreign taxpayers, nor is it intended to address all of the possible federal income tax consequences to Holders of Claims against the Debtor. This description also does not discuss the possible state tax or non-U.S. tax consequences that might apply to the Debtor or to Holders of Claims.

**B.  Tax Consequences of Payment of Allowed Claims Pursuant to Plan Generally**

The federal income tax consequences of the implementation of the Plan to the Holders of Allowed Claims will depend, among other things, on the consideration to be received by the Holder, whether the Holder reports income on the accrual or cash method, whether the Holder's Claim is Allowed or Disputed on the Effective Date, and whether the Holder has taken a bad debt deduction or a worthless security deduction with respect to its Claim.  All Holders of Claims are urged to consult with their tax advisors concerning the tax consequences applicable under the Plan. Nothing contained herein shall be relied upon as tax advice.

**1.  Recognition of Gain or Loss**

In general, a Holder of an Allowed Claim should recognize gain or loss equal to the amount realized under the Plan in respect of its Claim less the Holder's tax basis in the Claim. Any gain or loss recognized in the exchange may be long-term or short-term capital gain or loss or ordinary income or loss, depending upon the nature of the Allowed Claim and the Holder, the length of time the Holder held the Claim and whether the Claim was acquired at a market discount or premium. If the Holder realizes a capital loss, the Holder's deduction of the loss may be subject to limitation. The Holder's tax basis for any property received under the Plan generally will equal the amount realized.

**2.  Bad Debt or Worthless Security Deduction**

A Holder who receives in respect of an Allowed Claim an amount less than the Holder's tax basis in the Claim may be entitled in the year of receipt (or in an earlier or later year) to a bad debt deduction in some amount under section 166 of the Internal Revenue Code. The rules governing the availability, character, timing and amount of bad debt deductions place considerable emphasis on the facts and circumstances of the Holder, the obligor and the instrument with respect to which a deduction is claimed. Holders of Allowed Claims, therefore, are urged to consult their tax advisors with respect to their ability to take such a deduction.

**3.  Receipt of Interest**

The Plan does not address the allocation of the aggregate consideration to be distributed to Holders between principal and interest and the Debtor cannot make any representations as to how the IRS will address the allocation of consideration under the Plan. In general, to the extent that any amount of consideration received by a Holder is treated as received in satisfaction of unpaid interest that accrued during such Holder's holding period, such amount will be taxable to the Holder as interest income (if not previously included in the Holder's gross income and not otherwise exempt from U.S. federal income tax). Conversely, a Holder may be allowed a bad debt deduction to the extent any accrued interest was previously included in its gross income but

37

subsequently not paid in full.  However, the IRS may take the position that any such loss must be characterized based on the character of the underlying obligation, such that the loss will be a capital loss if the underlying obligation is a capital asset.  Again, Holders of Allowed Claims should address all potential tax implications with their own tax advisors.

## XII.    CONFIRMATION OF PLAN – REQUIREMENTS

In order for the Plan to be confirmed, the Bankruptcy Code requires, among other things, that the Plan be proposed in good faith, that the Debtor discloses specified information concerning payments made or promised to insiders, and that the Plan comply with the applicable provisions of chapter 11 of the Bankruptcy Code.  Section 1129(a) of the Bankruptcy Code also requires that at least one Class of Claims has accepted the Plan ("Minimum Voting Threshold"), that Confirmation of the Plan is not likely to be followed by the need for further financial reorganization, and that the Plan be fair and equitable with respect to each Class of Claims that is impaired under the Plan.  The Bankruptcy Court can confirm the Plan if it finds that all of the requirements of section 1129(a) have been met.  The Debtor believes that the Plan meets all of these required elements.  With respect to the so-called "feasibility" test (i.e., that the Plan is not likely to be followed by the need for further financial reorganization), the Plan provides for an orderly liquidation of the Debtor's assets and the Debtor believes that it will be able to consummate the Plan fully.

In the event that a Class of Claims votes to reject the Plan, the Plan does not satisfy all of the requirements of section 1129(a) of the Bankruptcy Code.  Although the Minimum Voting Threshold is not met, the Bankruptcy Court nevertheless may confirm the Plan under the "cram down" provisions of section 1129(b) of the Bankruptcy Code if all of the other provisions of section 1129(a) of the Bankruptcy Code are met.  Thus, the Debtor presently intends, to the extent necessary, (i) to undertake to have the Bankruptcy Court confirm the Plan under the "cram down" provisions of section 1129(b) of the Bankruptcy Code, and (ii) to amend the Plan to the extent necessary to obtain entry of the Confirmation Order.

In order to confirm a Plan over the dissenting vote of an impaired Class under section 1129(b) of the Bankruptcy Code that satisfies the remaining provisions of section 1129(a) of the Bankruptcy Code, the Bankruptcy Court, on request of the proponent of a plan, "shall" confirm the Plan if the Plan does not discriminate unfairly, and is fair and equitable with respect to each Class of Claims that is impaired under, and has not accepted, the Plan.  For purposes of section 1129(b) of the Bankruptcy Code, a Plan is "fair and equitable" with respect to a class of unsecured Creditors if, at a minimum, it satisfies the "absolute "priority rule" and the "best interests of creditors test."

### A.    Absolute Priority Rule

To satisfy the absolute priority rule, the Plan must provide that the Holder of any Claim that is junior to the Claims of the dissenting Class will not receive or retain under the Plan on account of such junior Claim any property unless the Claims of the dissenting Class are paid in full.

The Debtor believes that the Plan satisfies the absolute priority rule.  The Debtor further believes that all non-accepting impaired Classes will receive or retain payment or Distribution, as the case may be, on account of their Claims, sufficient to permit full satisfaction of such Claims before junior Classes receive or retain any property on account of such junior Claims.

**B.  Best Interest of Creditors Test; Liquidation Analysis**

Under the best interest of creditors test, the Plan is confirmable if, with respect to each impaired Class of Claims, each Holder of an Allowed Claim in such Class has either (i) accepted the Plan, or (ii) receives or retains under the Plan, on account of its Claim, property of a value, as of the Effective Date, that is not less than the amount such Holder would receive or retain if the Debtor was to be liquidated under chapter 7 of the Bankruptcy Code.

To determine what the Holders of each Class of Claims would receive if the Debtor was to be liquidated under chapter 7 of the Bankruptcy Code, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the Debtor's remaining assets in a chapter 7 liquidation case.  The amount that would be available for satisfaction of the Allowed Claims of the Debtor would consist of the proceeds resulting from the disposition of the remaining assets of the Debtor augmented by the cash held by the Debtor at the time of the conversion of the Chapter 11 case to a chapter 7 case.  Such amounts would be reduced by the costs and expenses of the liquidation and by such additional Administrative Expense Claims and other priority Claims that might result from the chapter 7 case.

Here, the Plan contemplates the creation of a Plan Administrator to continue the wind-down of the Debtor's Estate.  The Debtor believes that a conversion of the Chapter 11 Case to a case under chapter 7 would disrupt an orderly plan process which is expected to result in a prompt initial distribution to Holders of Allowed Class 2 and 3 Claims, and that Creditors would be harmed by the delay and expense that would result.

To determine if the Plan, as proposed, is in the best interests of Creditors, the present value of the distributions likely to be made to each class in a liquidation if the bankruptcy case proceeded under Chapter 7 are compared with the present value of the distributions to each impaired Class provided for by the Plan.

In applying the best interest test, it is possible that Claims in a chapter 7 case may not be classified in the same manner as provided for by the Plan.  Priorities and order of distribution of estate assets are established by the applicable provisions of chapter 7.  Under those provisions, each class of Claims is paid in a descending order of priority.  No junior classes of Claims are paid until all senior classes have received payment in full.  In the event that available assets are insufficient to pay all members of such class in full, then each member of the class shares on a *pro rata* basis.

The Debtor believes that the primary advantage of the Plan over a chapter 7 liquidation is that Creditors will likely receive more under the Plan than they would in a chapter 7 case and receive their Distributions earlier.  Costs would increase by the amount of the additional administrative expenses likely to be incurred in such a chapter 7 case, including the costs of time-

consuming investigations and discovery. Under the Plan, the process of other Claims resolution will proceed without the necessity for additional investigation by a chapter 7 trustee and its separate and new professionals. The Plan offers the opportunity to avoid additional administrative costs and the resulting delay which would result from a chapter 7 liquidation. In addition, the Plan provides, for purposes of administrative convenience, that no distribution of less than $100 shall be made pursuant to the Plan, thereby saving the estate significant costs. Those cost savings would be lost in a chapter 7 case.

The Debtor therefore believes that the Plan will result in lower total administrative costs, and higher recoveries for Creditors than would the liquidation of the Debtor's Assets under chapter 7 of the Bankruptcy Code. A liquidation analysis that demonstrates the lower recovery for creditors in a chapter 7 liquidation is annexed hereto as **Exhibit A**.

Thus, the Debtor believes the Plan satisfies the "best interests of creditors test," and, indeed, that the Plan is in the best interests of Creditors.

### XIII. PLAN RELATED RISK FACTORS AND ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

#### A. Certain Bankruptcy-Related Considerations

##### 1. Parties in Interest May Object to the Debtor's Classification of Claims

Section 1122 of the Bankruptcy Code provides that a plan may place a claim in a particular class only if such claim is substantially similar to the other claims in such class. The Debtor believes that the classification of Claims under the Plan complies with the requirements set forth in the Bankruptcy Code. However, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

##### 2. Risk of Plan Not Being Confirmed

Although the Debtor believes the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion. There can also be no assurance that modifications of the Plan will not be required for Confirmation, that any negotiations regarding such modifications would not adversely affect the Holders of the Allowed Claims or that any such modifications would not necessitate the re-solicitation of votes.

##### 3. Nonconsensual Confirmation

As set forth above, in the event any impaired class of claims does not accept a plan, a bankruptcy court may nevertheless confirm such plan of liquidation at the proponent's request if at least one impaired class has accepted the plan of liquidation (with such acceptance being determined without including the acceptance of any "insider" in such class) and, as to each impaired class which has not accepted the plan of liquidation, the bankruptcy court determines that the plan of liquidation "does not discriminate unfairly" and is "fair and equitable" with respect to non-accepting impaired classes.

In the event that any Impaired Class of Claims fails to accept the Plan in accordance with section 1129(a)(8) of the Bankruptcy Code, the Debtor reserves the right to seek nonconsensual confirmation of the Plan in accordance with section 1129(b) of the Bankruptcy Code.

### 4. Risks that Conditions to Effectiveness Will Not Be Satisfied

Article 7 of the Plan contains certain conditions precedent to the effectiveness of the Plan. There can be no assurances that the conditions contained in Article 7 of the Plan will be satisfied.

### 5. Actual Plan Distributions May Be Less Than Estimated for Purposes of the Disclosure Statement

The Debtor projects that Claims asserted against the Debtor will be resolved in and reduced to an amount that approximates the estimates set forth herein. However, there can be no assurances that these estimates will prove accurate. In the event that the allowed amounts of such Claims are materially higher than the projected estimates, actual distributions to Holders of Allowed Claims could be materially less than estimated herein.

### 6. Claims Objections/Reconciliation Process

The Debtor and the Plan Administrator, as applicable, reserve the right to object to the amount of any Claim, except as provided in the Plan. The estimates set forth herein cannot be relied on by any Holder of a Claim whose Claim is subject to an objection. Any such Holder of a Claim may not receive its specified share of the estimated distributions described in the Disclosure Statement.

### B. <u>Alternatives to the Plan and Consequences of Rejection</u>

Among the possible consequences if the Plan is rejected or if the Bankruptcy Court refuses to confirm the Plan are the following: (i) an alternative plan could be proposed or confirmed; or (ii) the Chapter 11 Case could be converted to a liquidation case under chapter 7 of the Bankruptcy Code.

### 1. Alternative Plans

With respect to an alternative plan, the Debtor has explored various alternative scenarios and believe that the Plan enables the Holders of Claims to realize the maximum recovery under the circumstances. The Debtor believes the Plan is the best plan that can be proposed and serves the best interests of the Debtor and other parties-in-interest.

### 2. Chapter 7 Liquidation

As discussed above, with respect to each Class of Impaired Claims, either each Holder of a Claim of such Class has accepted the Plan, or will receive under the Plan on account of such Claim, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtor was liquidated on such date under chapter 7 of the Bankruptcy Code. The Debtor believes that significant costs would be incurred by the Debtor

41

as a result of the delay that would be caused by conversion of the Chapter 11 Case to a case under chapter 7, resulting in a reduced distribution to all Creditors.

**XIV.    <u>PROCEDURES FOR VOTING ON PLAN</u>**

As noted above, pursuant to the Bankruptcy Code, a plan groups various claims into classes, each consisting of parties having similar legal rights in relation to a debtor.  Each class may then be treated as either "impaired" or "unimpaired" under a plan.  There are three ways in which a plan may leave a claim or interest "unimpaired." First, a plan may not propose to alter the legal, equitable or contractual rights of the Holder of the claim or interest.  Second, all defaults (excluding those covered by section 365(b)(2) of the Bankruptcy Code) may be cured and the original terms of the obligation reinstated.  Third, a plan may provide for the payment in full of the obligation to the Holder of the claim or interest.  If a class is unimpaired, then it is conclusively presumed to vote in favor of a plan.

An impaired class that would receive nothing under a plan is deemed to have rejected such a plan.

An impaired class that is proposed to receive any Distribution (whether in Cash, securities or other property) has the right to vote, as a class, to accept or reject the plan.  A class of Creditors accepts a plan if more than one-half (1/2) of the ballots that are timely received from members of such class, representing at least two thirds (2/3) of the dollar amount of Claims for which ballots are timely received, vote in favor of such plan.  Section 1126(e) of the Bankruptcy Code provides that a Creditor's vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that the Creditor's vote either to accept or reject a plan was not solicited or cast in good faith, or in compliance with the Bankruptcy Code.  A plan under which any class of Claims is impaired may be confirmed by the Bankruptcy Court only if it has been accepted by at least one such class.

Each Holder of an Allowed Claim in an impaired Class which retains or receives property under the Plan shall be entitled to vote separately to accept or reject the Plan and shall indicate such vote on a duly executed and delivered Ballot as provided in such order as is entered by the Bankruptcy Court establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order or orders of the Bankruptcy Court.

Holders of Claims in an impaired Class entitled to vote will receive, together with this Disclosure Statement, a Ballot to be used in voting to accept or reject the Plan.  Voting instructions will accompany the Ballot.

Each Creditor should first carefully review this Disclosure Statement and the Plan.  The Creditor should then complete the portions of the Ballot indicating the Class in which the Creditor's Claim falls and the total dollar amount of the Claim.  It is critical that the Class and amounts(s) of the Claim be correctly stated on the Ballot, so that the Creditor's vote can be properly counted.

Next, the Creditor should mark in the space provided on the Ballot whether the Creditor wishes to accept or to reject the Plan.  Please be sure to fill in the name of the Creditor for whom the Ballot is being filed.  Finally, the Ballot must be signed by the Creditor, or by an officer, partner, or other authorized agent of the Creditor.  Please note that the Debtor reserves the right to object to the allowance, designation of Class and/or allowable amount of any Claim set forth in a Ballot for purposes of voting and/or Distribution under the Plan.

Completed and signed Ballots should be returned to the Voting Agent at the following address:

> *By First Class Mail or Overnight/Hand Delivery:*
>
> Publishers Clearing House LLC Ballot Processing
> c/o Omni Agent Solutions, Inc.
> 5955 De Soto Ave., Suite 100
> Woodland Hills, CA 91367

Additionally, Ballots can be submitted electronically to the following website:

> https://omniagentsolutions.com/PCH-Ballots

Completed Ballots should be returned as soon as possible, and in any event so that they are RECEIVED NO LATER THAN ____, 2025 AT 5:00 P.M. (EST) ANY BALLOTS WHICH ARE RECEIVED BY THE VOTING AGENT AFTER ____, 2025 AT 5:00 P.M. (EST) SHALL NOT BE COUNTED IN DETERMINING ACCEPTANCE OR REJECTION OF THE PLAN.

## XV.    CONFIRMATION HEARING

The Confirmation Hearing will be held before the Honorable Martin Glenn, Chief United States Bankruptcy Judge for the Southern District of New York via Zoom for Government on ____, 2025 at ___ a.m. (EST), as such date may be continued or adjourned by the Court.  All attorneys and participants are required to register their appearance **by 4:00 PM one business day before the Hearing** with eCourt Appearances. Parties wishing to participate at or listen to the Hearing, whether (a) an attorney or non-attorney, or (b) making a "live" or "listen only" appearance before the Court, **all need to register an electronic appearance (an "eCourt Appearance")** through the Court's website at https://ecf.nysb.uscourts.gov/cgi-bin/nysbAppearances.pl or by clicking the "eCourtAppearances" tab on Judge Glenn's page of the Court's website at http://www.nysb.uscourts.gov/content/chief-judge-martin-glenn.  When making an eCourtAppearance, parties must specify whether they are making a "live" or "listen only" appearance.

At the Confirmation Hearing, the Bankruptcy Court will decide whether the Plan should be confirmed, and will hear and decide any and all objections to the Plan.  Any Creditor, or other party in interest who wishes to object to Confirmation of the Plan, or to the classification of Claims or Equity Interests provided in the Plan, must, not later than **5:00 p.m. (EST) on** ____, 2025, file an objection with the Clerk of the United States Bankruptcy Court, Southern District of New York, One Bowling Green, New York, New York 10004, and serve a copy of the objection on the

43

following persons:  (a) counsel to the Debtor: Klestadt Winters Jureller Southard & Stevens, LLP, 200 West 41st Street, 17th Floor, New York, New York 10036, Attn:  Tracy L. Klestadt, Lauren C. Kiss, Stephanie R. Sweeney, and Andrew C. Brown, (b) the Office of the United States Trustee for the Southern District of New York, One Bowling Green, Suite 534, New York, NY 10004, Attn:  Tara Tiantian, and (c) parties filing a notice of appearance and request for service herein.

Any objections to the Plan which are not filed and served by the above date may not be considered by the Bankruptcy Court.  Any person or entity who files an objection to Confirmation of the Plan or to the classification of Claims provided in the Plan must also attend the Confirmation Hearing, either in person or through counsel.

If the Plan is confirmed, its provisions will bind the Estate and any and all Persons, including all Holders of Claims, whether or not the Claim of such Holder is impaired under the Plan and whether or not the Holder has, either individually or by a Class, voted to accept the Plan.

## XVI.  **RECOMMENDATION**

The Debtor believes that the Plan provides for the fair and equitable treatment of the Debtor's Creditors and therefore recommends that Creditors vote to accept the Plan.

[*Signature Page Follows*]

44

Dated: ~~August 8~~October 22, 2025

**382 CHANNEL DRIVE LLC, F/K/A**
**PUBLISHERS CLEARING HOUSE LLC**

By:  */s/ William H. Henrich*
      William H. Henrich
      Co-Chief Restructuring Officer

Approved as to form:

**KLESTADT WINTERS JURELLER**
**SOUTHARD & STEVENS, LLP**

By: */s/ Tracy L. Klestadt*
    Tracy L. Klestadt
    Lauren C. Kiss
    Stephanie R. Sweeney
    Andrew C. Brown
    200 West 41st Street, 17th Floor
    New York, New York 10036
    Tel: (212) 972-3000
    Fax: (212) 972-2245
    Email: tklestadt@klestadt.com
           lkiss@klestadt.com
           ssweeney@klestadt.com
           abrown@klestadt.com

*Counsel to 382 Channel Drive LLC, f/k/a*
*Publishers Clearing House LLC, Debtor*
*and Debtor-in-Possession*

45